### IN THE

# COURT OF COMMON PLEAS,

#### FOR THE

## CITY AND COUNTY OF NEW YORK.

---

### ASTOR PLACE RIOT CASE.

THE PEOPLE *against* EDWARD Z. C. JUDSON *et al.*[*]

[NEW YORK GENERAL SESSIONS.]

(September Term, 1849.)

Before Judge CHARLES P. DALY, of the New York Court of Common Pleas, and two Aldermen.

The right of the people peacefully to assemble to discuss or deliberate upon matters of a public or of a private nature, is to be distinguished from assembling with an intent to commit violence upon persons or property, to resist the execution of the laws, to disturb public order, or for the perpetration of acts creating public terror or alarm.

Any tumultuous assemblage of three or more persons coming together for no legal or constitutional object, deporting themselves in such a manner

---

[*] The report of this case was prepared from the journals and newspapers· of the time, by the late Judge J. W. Edmonds, and inserted by him in the 2d volume of Edmonds' Select Cases. The whole edition of this second volume of the judge's reports, however, was destroyed by a fire in the printing establishment of the publishers, Weed, Parsons & Co. ; and as the volume was not reprinted in full, it is thought that the insertion of

as to endanger the public peace and excite terror and alarm in rational and firm-minded persons, is unlawful.

A riot is the tumultuous disturbance of the public peace by three or more persons assembled together of their own authority, mutually assisting each other against all who oppose them in the execution of some design, in a violent and turbulent manner, to the terror and alarm of bystanders and the neighborhood: an offense in which there must be three and may be many actors.

In a certain sense they must be engaged in a private purpose, that is, as distinguished from a public attempt to overthrow or subvert the government by arms, force or violence, which is treason.

There must be concert of action, but it may exist in the execution of the act. It is not necessary that the parties should deliberate beforehand, or interchange views with each other before entering upon the execution of their design.

A common design is shown where a number of persons attempt to force their way into a theater, where, for that purpose, they attack the police who are guarding it, where they unite to rescue those who are taken into custody by the police, where they assail the theater with stones and other missiles, breaking the windows, forcing in the door and otherwise injuring it, and are rallied by common cries, and by the direction of leaders, to resist the police, the military, and all others who are endeavoring to disperse them and restore public order.

An unlawful assembly is when parties come together with an intent to execute an unlawful act. It is a riot where they move forward to the execution of their design, and a riot when they engage in the execution of it with force and violence, to the terror of the people.

An affray is where two or more come together without any premeditated design to disturb the public peace and break out into a quarrel among themselves, and is distinguishable from a riot where there is more or less concert of action, mutual co-operating and assisting of each other for a common purpose, whether it be a general disturbance of the peace or an attack upon individuals, the destruction of property, or any other object which is unlawful, for the accomplishment of which they act unitedly, or in separate parties or bands.

Where many individuals are acting separately, or in small parties distinct from each other, at different times and at different places, but manifestly for the same general purpose, as to break into a theater, or to injure it

---

the case here may be useful, as it contains much relating to the law of riots and unlawful assemblies, as well as being of historical interest, from the very full account it contains of the public event out of which the trial grew. Though voluminous and entering much into minute details, it is thought best to insert it as the judge had prepared and printed it without abridgement or alteration. At the time of the trial of the case, the New York Court of General Sessions constituted a part of the Court of Common Pleas (See History of the Court of Common Pleas, &c., 1 E. D. Smith, xvii).

People v. Judson.

by the throwing of stones and missiles, or to resist or attack those who are there in authority to preserve the peace, it is not a series of affrays, but a general riot.

The law does not distinguish between the relative degrees of violence on the part of individuals in a riot, but all who take part, aid and assist in it are principals, and responsible for all that takes place. Any act in aid of or furthering the common design is sufficient. It is not necessary that a party should do any physical act, such as throwing a stone, or commit personal violence, or be armed with weapons, or make use of threatening speeches. If, by any act of his done with intent to create it, he assists to bring it about, or, if by signs, words, gestures, cries, shouting, or any other thing, he aids to promote or to augment it, he is answerable as a principal.

The privilege of an audience at a theater to give spontaneous expression to the feelings of approbation or disapprobation which the representation inspires, is of immemorial usage; but it does not imply a right to create a tumult in the theater, to throw missiles at the actors, to destroy property, or the right of a few to give or to continue the expression of their disapprobation in such a manner as to prevent the majority present from witnessing the performance if they desire to do so. Nor have a number of persons the right to combine together and go to the theater to prevent a dramatic representation by noise and tumult, or to hiss a particular actor who may be obnoxious to them, or prevent his performing; the obvious course of those who object to the performance, or to the actor, being to abstain from giving countenance to either by their presence at the theater.

Those who engage, aid and assist in a riot, may be included in one indictment and tried together for the general offense. They are not entitled, as a matter of right, to separate trials. It is, however, in the discretion of the court to grant any of them a separate trial, and that discretion will be exercised where there is reason to apprehend, on the part of the court, that, by mingling the case of one with the others, he may not have a fair trial, or that it may operate seriously to his detriment.

Where many defendants are tried together for riot, each one is entitled to five peremptory challenges under the statute giving that number of peremptory challenges to persons tried for misdemeanors.

Ordinarily, a motion to quash an indictment should be made before the prisoner enters upon his defense and before the evidence is given, but it is a matter wholly in the discretion of the court, and the motion will be heard before the case is submitted to the jury, if the effect of hearing it then will be to economize the public time.

The history of the riot detailed.

## HISTORY OF THE RIOT.

IN the autumn of 1848, William C. Macready, a well-known and eminent English tragedian, came to this country to play a farewell engagement. Some hostility existed

between him and Edwin Forrest, an equally well-known and eminent American tragedian, arising, as Macready assumed, from the unfriendly course of Forrest toward him while Macready was playing in this country in 1844, and, as Forrest claimed, from the course pursued toward him by Macready while the latter was playing in England, which hostility was greatly augmented by Forrest having hissed Macready, in Edinburgh, for introducing something of his own in playing the character of Hamlet. When Macready was announced to appear in the city of New York, in 1848, it was anticipated that some opposition would be manifested toward him by the friends of Forrest, but Forrest dissuaded them from any such attempt. Macready went through his engagement without interruption, and, upon his benefit night, injudiciously, in a speech to the audience, referred to the project of a party or faction to excite hostile feelings against him, and of its failure, in language which had the effect of arousing an active opposition to him on the part of the friends of Forrest. He was attacked by a Boston newspaper while performing in that city, and, upon his subsequent appearance in Philadelphia, a riot in the theater was prevented only by the strenuous exertions of the manager and the presence of a strong police force. At the close of this engagement, Macready, in his speech to the audience, referred to the ungenerous treatment he had received at the hands of an American actor, and Forrest replied, in a card in a Philadelphia newspaper, charging Macready with instigating persons to write him down in the newspapers while he was in England, and procuring his friends to go to the theater to hiss and drive him from the stage; in which card he applied to Macready such epithets as "superannuated driveler," "poor old man," and spoke of the disturbed state of his guilty conscience; to which card Macready rejoined by another, denying the truth of Forrest's statements, and threatening an action for libel. No further attempt was made to oppose Macready, although he continued to be assailed in the newspapers, until his re-appearance at the Astor Place Opera House, in May,

1849, where, upon the first night of his appearance, he was prevented from performing by the hisses and demonstrations of a number of persons acting in concert, who displayed banners, with inflammatory appeals, in different parts of the house. As he persisted in performing, the demonstrations against him became more violent; chairs and missiles were thrown upon the stage, and he was compelled to desist from his attempt. As the hostility against him was supposed to proceed from a very limited number of persons, who had organized together to drive him from the stage, it elicited strong expressions of condemnation on the part of several of the public newspapers, and forty-eight prominent citizens signed and published a letter requesting him to reconsider his determination not to perform, and assuring him that the good sense and respect for order in the community would sustain him upon the subsequent nights of his performance; in consequence of which letter he was announced to appear on the evening of May 10th, 1849. This letter had a very different effect from what its signers anticipated, and greatly intensified the opposition. It was regarded as a challenge or defiance, by a few representing the wealthier classes, to the less prominent part of the community, and national prejudices and antipathies were aroused by appeals through certain newspapers, prominent among which was a weekly publication denominated *Ned Buntline's Own*, conducted by E. Z. C. Judson, one of the defendants, and by the posting and distribution of incendiary handbills throughout the city. Through these means, and from a report, which spread extensively, that the officers and crews of the British vessels and steamers in the harbor would assemble at the theater to sustain Macready, the excitement became general throughout the city, and, a serious disturbance being apprehended, the mayor advised the managers of the opera-house to close it for that evening, and abandon any further attempt of a public performance in the city on the part of Macready. The managers, however, insisted upon their right, under their license, to open the theater and perform, and the pub-

lic authorities, in recognition of it, took measures to prevent
any disturbance of the peace by stationing a strong police
force in and around the opera-house; and arrangements
were made with the major-general commanding the uni-
formed militia to have an efficient military force in readi-
ness to sustain the authorities, if necessary. Long before
the opening of the opera-house, large crowds assembled
about and in front of it, and upon the opening of the doors
the theater was speedily filled by persons having tickets,
and without any disturbance or disorder. When Macready
appeared the whole audience rose, and, the great bulk of
those present being friendly to him, he was received with
cheers and waving of handkerchiefs, mingled with the
groans and hisses of the few who were opposed to him.
The noise continuing, a placard was displayed from the
stage, requesting those in favor of order to remain quiet,
which was complied with. About ten or fifteen persons,
however, in the parquet, and some in the gallery, continued
their opposition by hissing and angry demonstrations, and,
as they would not desist, they were arrested by the police.
Order was temporarily restored, and the play proceeded,
but with occasional interruptions and hisses. Meanwhile
the crowd upon the outside of the theater had largely aug-
mented, and a group of young men, about twenty in num-
ber, were especially active in fomenting disturbance, con-
spicuous among whom was the defendant Judson, with whom
many of the young men frequently conferred, and who
appeared to be acting as their leader. Judson was heard
to say, " It is a shame that Americans should be served
so ! " and after a conference with three of the young men,
in a low tone, Judson called out, " Now, boys, whatever
you have to do must be done quickly ! " and one of the
young men shouted, " Now, boys, for a shower ! " to which
Judson, in his assumed capacity as a leader, called out,
" Hold, until you are all ready ! " and immediately a volley
of stones was discharged against the walls and windows of
the opera-house, upon which the police arrested several of
the participants, but not without resistance on the part of

People v. Judson.

others. In the interior of the house the play was proceeding, when it was suddenly interrupted by a large paving stone, which came through one of the windows and fell among the audience, followed by other stones, smashing the panels of the doors and falling in the lobby and other places. The wildest scene of confusion ensued in the interior of the theater, which was heightened by the cry that it was on fire under the parquet, which proved to be the fact; and through this timely warning the fire was speedily extinguished. Notwithstanding the activity of the police in making arrests, the attacks upon the opera-house were continued outside with increased violence. A large number now united in assailing it with stones, breaking the windows and attempting to force the doors at the entrances, which attacks were resisted by the police, and the doors were barricaded from the inside, when a proposition was made, but not carried out, to enter the building from the rear by ladders, a plan devised by the prisoner Judson, who had had ladders brought there for that purpose, with the design of entering the building in that way to put a stop to the performance and drive out the audience. The crowd on the Eighth Street side of the theater, as described by the witnesses, was wild with excitement, and at the front, upon Astor Place, were wrought up to the highest pitch, heaving to and fro like the waves of the ocean, the number of persons being variously estimated at from ten to twenty thousand. Stones and missiles were flying in all directions, and the police, after vainly endeavoring to allay the disturbance, and deserted by the mayor, who fled from the scene, were compelled to keep compactly together for their own security. The recorder and the sheriff, who were upon the spot promptly, placed themselves at the head of the police and kept them together, who were now assailed with stones, missiles and cries of derision from every quarter, in their unavailing attempt, as a body, to disperse the crowd, and some of them were very severely injured.

As it was apparent that the police force was insufficient to protect the building or to quell the riot, which had

increased to alarming proportions, the sheriff, with the advice of the recorder, dispatched a messenger for the military. The major-general had ordered the Seventh Regiment of Infantry, known as the National Guard, and a troop of horse, to assemble at the arsenal, fully equipped, but, owing to the shortness of the notice, a force of but two hundred and seven men, in all, had assembled when the call came for their services; and this body, under the command of Colonel Duryea, and accompanied by Major-General Sandford and Brigadier-General Hall, hastened to the scene of disturbance. Upon entering Astor Place, the troop of horse, which was in front, was assailed by a shower of stones and brickbats, which was so continuous and rapid that nearly every man in the troop was injured. Their horses became unmanageable, and, being thrown into confusion, they individually galloped off, leaving the infantry alone to contend with the rioters. The small body of infantry was speedily wedged in by the pressure of the crowd upon either side, and assailed by opprobrious epithets and paving stones, an ample supply of which was at the command of the rioters, from a large pile in the street, the pavement having been recently taken up to put down water pipes. The military, however, being kept together in good order and efficiently commanded, forced their way through the crowd and cleared the rear of the theater, the rioters retreating before them as they advanced, and, having effectually cleared Eighth Street, a cordon of police was thrown across it, to prevent any further access to it by the rioters. The military then passed through Eighth Street to Broadway, accompanied by the recorder and the sheriff, and turned into Astor Place, to force back the crowd from that side of the theater, the rioters retreating before them until the military had reached to about the center of the opera-house, when the crowd, either from the pressure behind, or from the determination to resist, remained stationary, and commenced assaulting the military with showers of paving stones and brickbats, by which nearly the whole of the first platoon were injured, and also the colonel commanding, the

recorder and several others. At this moment a pistol was fired from the crowd, which wounded one of the captains, whereupon General Sandford, and General Hall, who accompanied him, called out repeatedly to the crowd to fall back and disperse, or that they would be fired upon, but were answered only by derisive cries, and by the crowd rushing forward upon the military, during which the commanding general was knocked down, together with several soldiers in the front rank, the whole body being forced back toward the opera-house, followed by continuous showers of stones. At this juncture the order was given to charge bayonets, and the attempt was made, but it could not be done; the pressure of the crowd was so close that the muskets of several of the soldiers were forcibly taken from them by some of the more active of the rioters. The commanding general now apprised the recorder and the sheriff that it would be impossible for the military to maintain themselves without firing, and the sheriff, with whom that discretion was supposed to be lodged, after repeated calls to the rioters, on his part and that of the recorder, to fall back, or that they would be fired upon, which were received with defiant shouts of " Fire, if you dare ! " gave the order to fire. General Hall suggested to fire over the heads of the crowd, which order was given, and the military fired in that manner. It was followed by a shout, " They have only blank cartridges ! Give it to them again ! " and another volley of paving stones followed, by which the recorder and several others were struck, and one or two severely injured. The order was then again given to fire, and to fire low, which was done, when exclamations were heard that men had been shot ; and for the first time the mob gave way, and the military advanced, driving the rioters before them. The latter rallied again at the corner of Lafayette Place and advanced upon the military, discharging a volley of stones, by which several of the soldiers were hurt severely, when another order was given to fire, which was executed, and proved so effectual that the bulk of the rioters fell back and dispersed, keeping up, however,

for some time, an attack upon the military, with stones and brickbats, until the latter, without firing again, got complete possession of the ground, and order was restored. Twenty-three persons were killed upon the spot by the fire of the military, or died afterward of their wounds, and twenty-two were wounded, independent of injuries and severe wounds received from paving stones by many of the police and the military. Many of the killed and wounded were merely spectators, who had taken no part in the riot, or persons who were passing at the time. A woman walking with her husband, in Broadway, was shot dead; a man was killed instantly by a musket ball while stepping from a Harlem railroad car; an eminent merchant was wounded in the neck by a ball while standing in the Bowery, and another person was severely wounded by a shot in St. Mark's Place, two blocks off from the scene of the riot; a Mr. Gedney was shot dead while looking at the riot from the corner of Astor and Lafayette places, and his own brother was in the platoon by which the volley had been fired.

A very full investigation of the riot was instituted by the coroner's jury, who found that the persons killed came to their death from gun-shot wounds fired by the military, by the order of the civil authorities, and that, in the opinion of the jury, the circumstances existing at the time justified the authorities in giving the order to fire upon the mob. An investigation was also instituted, before the Hon. John W. Edmonds, presiding justice of the Supreme Court, as a committing magistrate, to inquire into the cause of the riot, by whom it was instigated, aided or abetted, and, upon the information thus elicited, additional arrests were made. As the recorder, the Hon. Frederick A. Tallmadge, had participated as a magistrate in quelling the riot, his place as presiding judge of the Court of Sessions was filled by the Hon. Charles P. Daly, one of the judges of the New York court of Common Pleas, who, at the opening of the June term of the court, 1849, delivered the following charge to the grand jury:

People *v.* Judson.

### JUDGE DALY'S CHARGE TO THE GRAND JURY.

*Gentlemen of the Jury:* As his honor the recorder, from a sense of the delicacy of his situation as one of the magistrates engaged in quelling the recent disturbance at the Astor Place Opera House, is desirous of abstaining from taking any part in the trial of those accused of offenses growing out of that affair, and as the whole matter will be brought before your body at the present term, the task devolves upon me of giving you the necessary instructions preparatory to entering upon the discharge of your duties.

It is seldom, gentlemen, that the grand jury of this county are called to the discharge of a duty so grave and important as that which will be brought before you in connection with this deplorable occurrence. The great destruction of human life that attended the efforts of the authorities to preserve public order; the principles involved in the creation and suppression of the disturbance, and the necessity which exists for a most thorough investigation, invest this part of your duties with an unusual degree of public interest, and imposes upon your body a responsibility of no ordinary character. It is not to be disguised, gentlemen, that, within the last few years, the disposition to substitute force and violence for the peaceful administration of the law has been upon the increase. Officers of justice engaged in the execution of its process have been deliberately shot down, the houses of obnoxious individuals broken open, their persons insulted and their property devoted to destruction, and, under a constitution breathing the very spirit of toleration, and a form of government preeminently recognizing the freedom of opinion, even places of public worship have not been exempt from the assault of the rioter. Indeed, so unblushingly is this disposition acknowledged, that an organization of individuals has long been kept up, and is still maintained, in a sister city, for the avowed purpose of breaking the laws with impunity, under the sanguinary appellation of " The Killers." Alarm-

ing as this state of things must be, and calculated as such acts are, to stir the patriotism and rouse the energy of every right-minded citizen, still more alarming is the sympathy with such acts that has found its way even to the highest places of authority; for not only has the strong arm of the law been relaxed in the prosecution of offenders, but, after their conviction, magistrates, in whom is vested the discretion of softening the rigor of punishment, have manifested indecent haste in absolving offenders from the consequences of their acts. If there is a government, gentlemen, upon earth, in which an unauthorized resort to violence is without excuse, it is that under which we live. In other countries, where the modern political maxim prevails, of every thing for the people, but nothing by them—where government is a thing apart, and the great majority of the governed have no voice in the regulation of the institutions by which they are ruled—it is not surprising that they should occasionally resort to violence to obtain their rights, no other remedy being left them. But, under institutions like ours, where every man is an integral part of the government, and has a voice in the creation of its laws; where the remedy for redressing grievances and reforming abuses is both certain and speedy, an unauthorized appeal to physical force is wholly without apology. Obedience to the laws of his own creation is the first duty of the citizen, and when he refuses to render it he contravenes the great principle which holds a republican community together.

Liberty, with us, is a constitutional term, embodying a practical idea. It means the enjoyment of the rights which belong to us as individuals. To secure this to every human being is the object of social organization and the end of government. Man is not to be viewed as an isolated or independent being. We must look upon him as we find him in the social state, and the rights that belong to him are determined by the relation which he holds in that state to his fellow men. That relation, or, rather, the necessity that all should participate equally in the enjoyment of a common right, leads to the institution of a government of

laws instead of the arbitrary will of individuals. The law, which is the representative of man's aggregate power in the social state, defines, regulates and secures the rights of each individual, and upon its supremacy depends the existence of civil liberty. In the practical sense, therefore, in which we understand liberty, there is nothing imaginative or utopian about it. It implies the duty of obedience to laws, which, if unsuited to our condition, we have the constitutional right to change, but which, while in force, we are bound to obey. If there is any thing which should take the form of a national sentiment among us, it is a respect for the majesty of the law. It is the vital principle of our political organization. Recognized by the popular mind and implanted in the popular heart, it is to us what loyalty is to the English, or what the reverence for the state was to the nations of antiquity. It is true that the law will not always fit the exigency of every case, and that the application of fixed and positive rules may furnish but inadequate justice in particular instances; but he that objects to their general utility for this reason would dispense with the sun for the spots upon its surface. In this respect the law shares in the infirmities of every thing human—perfection being an attribute of the Deity alone.

It was deemed a great point gained in the progress of English liberty when it was conceded that no man was above the law; and the rioter now who stirs up a commotion claims to exercise a privilege which was supposed to have expired with the barons of the feudal ages. The fruit of the growth of civil liberty has been the substitution of the supremacy of the law for the arbitrary will of man; and it matters not whether it is the will of one man or of a million, for to the individual sufferer it is of little consequence whether his rights are invaded by a single despot or trampled upon by a mob. In either case it is tyranny, and it is as objectionable in the one form as it is in the other. It is only by maintaining the supremacy of the laws that the liberty of the individual can be protected. It is the only safeguard to secure it from popular violence or aristocratic encroachment.

The great object of government, while securing to the individual the enjoyment of his rights, is to preserve society from the extremes of despotism or anarchy; and consequently, from the foundation of the world, the condition of political society has been little else but a series of experiments. That condition is undoubtedly the best which secures to the individual most of the advantages of government with the least amount of its pressure; and we have reason to believe, from past experience, that we have approached nearer to it than any government that has preceded us. In theory we have certainly done so, and we have but to maintain practically the principles upon which our institutions are based to realize every thing that government can bestow.

These considerations, gentlemen, have led me to refer to the responsibility resting upon your body. You are now to investigate the facts connected with this unhappy occurrence, and to declare who shall be placed upon trial as the guilty actors in it. The supremacy of the law has been maintained, the peace of the city preserved, after a deplorable sacrifice of human life—a sacrifice involving the innocent as well as the guilty—and potent as should be the effect of such an example, its salutary effect may depend very much upon the manner in which it is followed up by the prosecution and punishment of the guilty. This city has hitherto been in a very great degree exempt from such scenes of violence and bloodshed. It is, I believe, the first instance in its municipal history, when the taking of human life has become necessary to maintain public order; and if no other means were left to preserve the public peace, the authorities, by vigorously maintaining the supremacy of the law. even at the sacrifice of life, have set an example in this great metropolis which may be felt in the remotest part of our wide-spread confederacy. I express the hope, gentlemen, that, in the duty you have to perform, you will be fearless and firm, and while you will exercise that calm determination which is due to the impartial administration of justice, I trust that no respect for persons, no sense of fear nor disposition to favor, will lead you to falter in doing

People v. Judson.

your part for the maintenance of principles lying at the very foundation of the government. Your labors will necessarily embrace an investigation of all the events connected with this unhappy affair, including the conduct of the public authorities; and though a very searching examination was had before the coroner's jury, still, if you can throw any additional light upon it, it is your right, as it would be your duty, to make any public presentation which the interest of the community demands. Under this head, therefore, gentlemen, it may be proper to call your attention to the power given by the law to the public authorities for the maintenance of order. All magistrates are empowered to preserve the public peace, and justified in using whatever degree of force may be necessary for that purpose. In England, from which we derive the common law, the extent to which the authorities may go, and the manner in which they shall employ extreme force, has been a matter of statute regulation from the time of Edward IV. These statutes have undergone various changes and modifications, and such of them as were passed prior to our revolution, not being applicable to our form of government, are not in force in this state. The extent to which force may be used, and the manner in which it should be employed, rests with us, therefore, upon the principles of the common law, in connection with certain statutory provisions which have been enacted. From the long existence of the English statutes, it has been supposed that the right to employ extreme force for the suppression of riots was derived solely from these statutes; but Chief Justice Hale, a great authority on the common law, and one of the most fearless and upright of judges, says, that the right does not depend upon the statute, but exists at common law; that any magistrate or sheriff, if a riot cannot be otherwise suppressed, may make use of such force as shall be necessary; and that if, from the employment of it, death ensues, the act is justifiable. The right to employ military force for that purpose is expressly recognized in this state by an act passed in 1836, which declares that the First and Sixth brigades of artillery resi-

ding in the city of New York shall be subject to the order of the mayor whenever their services shall be required, in aid of the civil authorities, to quell riots, suppress insurrections, protect the property or preserve the tranquillity of the city. These brigades were consolidated by subsequent acts, but this provision remains unaffected. · This is an act, therefore, in aid of and in recognition of the common law, under which the mayor has undoubtedly the right to call out the military in aid of the civil authorities. The law, as well as common humanity, dictates, however, that this machinery, which has been aptly termed the last argument of tyrants, should be employed only upon great emergencies—that men armed with swift and certain messengers of death should not be brought to the aid of the civil authorities except as a last necessity. The example set by the city of London, upon the occasion of the great Chartist movement, of specially deputizing citizens as conservators of the peace, is worthy of the imitation of all municipal governments. It is true that the movement in that case was long anticipated, that it was of the most exciting public character, and that ample time was afforded to adopt the most judicious means to counteract any attempt at violence. This cannot always be the case. Tumults spring up which no sagacity could foresee, or assume a character which could not have been anticipated. All that the authorities can do in such cases is to adopt the readiest means at hand for their suppression. A prompt and judicious course is necessary ; but the most judicious does not always suggest itself in great emergencies. When promptness is shown, some indiscretion may be pardoned. It is easier to find fault than to act. This whole subject, gentlemen, is open before you, and you are left to take any course respecting it which public interest requires.

There are three offenses growing out of this transaction— conspiracy, riot and arson. Any combination of two or more persons, to commit an offense, is a conspiracy; and if the evidence before you justifies the belief that there was an organization beforehand, of two or more persons, with the

design of committing a riot at the theater, it will be your duty to indict them for a conspiracy. This is the first point of inquiry, and I hope you will probe it to the bottom; that you will, if possible, trace it to its source; and that if, beyond the mere visible actors, there are still more responsible authors, you will bring them to the light. Perhaps I need not tell you that he who plans such an enterprise is as guilty as the instruments he puts in motion.

As to the next branch of your inquiries, any disturbance of public order by force is a breach of the peace. Any tumultuous assemblage of three or more persons, brought together for no legal or constitutional object, deporting themselves in such manner as to endanger the public peace, and excite terror and alarm in rational and firm-minded persons, is unlawful; and whenever three or more persons, in a tumultuous manner, use force or violence in the execution of any design wherein the law does not allow the use of force, they are guilty of a riot. A riot may be defined to be a tumultuous disturbance of the public peace by three or more persons assembled together of their own authority, mutually assisting each other against all who oppose them, and engaged in executing some design in a violent and turbulent manner, to the terror and alarm of by-standers or the neighborhood. In a riot, all who participate are principals. It is an offense in which there must be three, or may be many, actors.

The law does not distinguish between the relative degree of violence used by individuals, but every one who participates is responsible for all that has taken place. All who have participated are to be jointly indicted and jointly tried. The only discrimination which the law makes is the discretion given to the court in apportioning the degree of punishment. If a riot takes place, all who aid, encourage or promote it, by words, signs, gestures, or other acts, are principals. It is not necessary that a party should commit personal violence; being armed with offensive weapons, or making use of threatening speeches or turbulent gestures; indeed, any act of assistance or encouragement is sufficient

to make him a principal.    Under this head your inquiries
will be directed to what took place at the opera-house and
its vicinity upon the evenings of Monday and Thursday.
The first will embrace what occurred within the theater;
the latter, what occurred within and without.    Whatever
opinion may be entertained of the propriety of dramatic
and theatrical representations, it is lawful to represent and
lawful to witness them.    One of the consequences result-
ing from this species of amusement is the right of the audi-
ence to give spontaneous expression to the feelings of
approbation or disapprobation which the representation
inspires.    This is nothing more than the right which any
one has to criticize a book, or any work of art, presented
for his entertainment or profit.    In the theater this has
been a right of immemorial usage; but it does not rest on
that alone, for it has received the solemn sanction of a
court of justice.    [The judge then read a decision of Sir
JAMES MANSFIELD, in a case arising out of the O. P. riots
of London.]    This is a privilege, as you will perceive by
the authority I have read, which has its limitations.    It
does not imply a right to create a tumult in the theater, to
throw missiles at the actors, or to destroy property.    Nor
does it imply the right of a few to give or continue the
expression of their disapprobation in such a manner as to
prevent the majority present from witnessing the perform-
ance, if they desire to do so.    Least of all does it imply a
right to combine, and go to the theater to prevent a partic-
ular performance, or to hiss an actor from the stage.    The
simple course for a person who dislikes an actor is to abstain
from visiting the theater when he plays; and if the patrons
of such places concur in that dislike, the interest of the
proprietor will speedily dictate the necessity of withdraw-
ing the performer.    There is no reason why a theater, more
than any other place, should be turned into an arena for
the display of lawless force and violence.    You will inquire
into all that transpired within the opera-house upon the
Monday night in question; and if you are satisfied that any

parties there were guilty of a riot, within the definition I have given, you will indict them accordingly.

The judge then referred to the events of Thursday night, and gave the same instruction, saying that the jury must distinguish between participants and mere spectators, and that it was very wrong for citizens to linger about the scene of a riot. By the accession of numbers they give confidence and boldness to the rioters, and render more difficult the efforts of the authorities to check it. But so strong is human curiosity that even well-disposed citizens are attracted by the excitement. To courageous minds there is a fascination from the very presence of danger, and a distinction must be carefully drawn between those who were mere lookers-on and those who were stimulating and encouraging the riot. He then defined the crime of arson, and referred to those charged with an attempt to fire the opera-house. He said the jury should also look into the conduct of the police force; and if any member of that body gave aid or countenance to the rioters, he should be indicted and made an example of. If he willfully neglected his duty, he is liable to be prosecuted; if he failed to perform it, he was unworthy of his place; and in scrutinizing the conduct of public officers, very little allowance should be made for the apprehension of personal danger, for if an officer lacked the constitutional courage essential to the discharge of his duty, he should abstain from intruding himself into such an office. He has no more excuse for his misconduct than the coward who enlists as a soldier.

The remainder of Judge DALY's charge related to certain local laws, and matters of less general interest. He closed by saying, in respect to the subject which had occupied the principal part of his charge, that if the grand jury did their duty, the court would not be found wanting in theirs.

## THE TRIAL.

The evidence taken before Judge EDMONDS and the affidavits and examination before the magistrates, previous to the commitment of the persons charged with creating, inci-

ting to, and participating in, the riot, were laid before the grand jury, who, on the 23d of June, 1849, found a bill of indictment against the following persons jointly, for riot :

| E. Z. C. Judson, | George Douglass, |
| Thomas Bennett, | John Norris, |
| James Matthew, | Hugh McLaughlin, |
| Alexander Hosack, | Thomas Green, |
| Daniel A. Adriance, | James O'Neill, |

all of whom were placed upon trial together, at the following September Term of the Court.

COURT OF GENERAL SESSIONS,
*for the City and County of New York.*

SEPTEMBER TERM, 1849.

*Before Judge* DALY, *of the Court of Common Pleas, and Aldermen* WOOD *and* KELLY.

*Jonas P. Phillips,* Assistant District Attorney, *John McKeon,* District Attorney, and *James R. Whiting,* Ex-District Attorney, appeared for the prosecution.

Counsel appeared for the prisoners, respectively, as follows: *James M. Smith,* for Judson; *E. Blankman,* for Bennett; *John D. Sherwood,* for Matthew; *E. Boudinot,* for Hosack ; *George I. Cornell,* for Adriance ; *Richard Busteed,* for Douglass; *John M. B. Scoles,* for Norris ; *J. M. Mason,* for McLaughlin; *Augustus Schell,* for Green ; *H. Morrison,* for O'Neill.

On the opening day of the trial, September 13th, 1849, an immense crowd gathered in and about the city hall, filling the passages leading to the court room, upon the opening of the doors of which the crowd forced their way in, filling every part of it almost instantly, and so completely blocking up all access to it that it was a long time before order could be restored, or the judges, counsel and officers could get in. As there was some apprehension of an attempt to rescue

the prisoners, they were brought in, after much difficulty, surrounded and strongly guarded by a powerful police force, when the trial proceeded, which lasted seventeen days, the court opening at nine in the morning, and sitting nearly every day until near midnight.

*James M. Smith,* counsel for the prisoner Judson, moved that he be tried separately, upon the ground that the other prisoners were strangers to him, with whom he was in no way connected, and that if tried together with them his defense might be confounded with theirs.    He further urged that strong prejudices had been excited against Judson since the riot by means of the public newspapers, which had been constantly denouncing as immoral and infamous the course of the weekly journal known as " Ned Buntline's Own," which was managed and edited by him, and had published many things about his life and character wholly distinct from the riot, and that it would be impossible for him to have a fair trial unless he was tried separately.    He also asked for the postponement of his trial upon the ground that he had been unable to secure the attendance of Moses H. Grinnell and Duncan C. Pell, signers of the letter calling upon Macready to perform, both of whom were material witnesses, but whom, after the greatest diligence, the prisoner was unable to subpœna, as they kept out of the way; and he further claimed that, as a matter of law, the prisoner was entitled to a separate trial if he thought proper to demand it.

*Busteed* also moved for a separate trial for Douglass, upon the ground that he was a minor and deaf, and because he was entitled to it as a matter of right.    *Cornell* made the same motion for Adriance, and *Scoles* moved to postpone the trial of Norris because of the absence of a material witness.

*McKeon,* District Attorney, challenged the counsel for the defense to produce a single case where persons indicted jointly for a riot had been granted a separate trial.    He

cited *Rex* v. *Scott et al.*, 3 Burr., 1262; *Rex* v. *Heaps*, 2 Salk., 594; *Regina* v. *Tulston and others*, 2 Ld. Ray., 1210; *Rex* v. *Sudbury and others*, 1 id. 484; *State* v. *Pugh and others*, 2 Hayw. N. C., 55; *Rex* v. *Cox and others*, 4 Carr. & P., 538, and Archbold's Criminal Law, upon the forms of the indictment, to show that all who participate in a riot may be indicted together and tried jointly.

*Whiting*, for the prosecution, said the application, as a matter of right, was preposterous, and that the application of Judson to postpone for want of witnesses was not made in good faith; that his affidavit did not show what efforts he had made to subpœna Messrs. Grinnell and Pell, nor what he expected to prove by them. He and all the prisoners had been indicted last June. They had had nearly three months to prepare for trial. They had all been advised for the last nine days that the case would be positively brought to trial to-day, and no one of them had shown that they had done anything to secure the attendance of the witnesses of whose absence they complained.

The *District Attorney* stated that he had dispatched a messenger to the place of business of Messrs. Grinnell and Pell; that both gentlemen declared that they were ready to come at once to the court whenever they were required; that they had never kept out of the way; that they had never been informed by Judson, or by any one, that they were wanted as witnesses; and that they might easily have been subpœnaed either at their residences or at their places of business. He further added, in respect to the claim of the prisoner Douglass for a separate trial, upon the ground that he was deaf and a minor, that it furnished and could furnish no explanation of what the prosecution would show, that he was taken in the act of throwing a brickbat, for which, as would appear, neither his youth nor his deafness had disqualified him.

Judge DALY.—The application is twofold. Four of the defendants move for separate trials, and two of these de-

fendants, in the event of the denial of that application, move to postpone the cause, from the absence of material witnesses. The grand jury have included all the defendants in one indictment, with the view that they should be tried together for one offense—the propriety of which course is obvious. The acts of each individual constitute part of the history of a common transaction; and, to enable the jury to determine whether a riot existed, they should have detailed to them the acts of all the parties indicted for creating or maintaining a riot. If the defendants, instead of being tried together, should be tried separately, it would be necessary to repeat a great portion of the same testimony in each case, which would lead to an unnecessary consumption of public time, and greatly increase the expense of the trial, to say nothing of the loss and inconvenience to jurors, witnesses, etc. There are, therefore, the strongest reasons for trying all the defendants together. The cases cited by the district attorney show that all who participate in a riot may be indicted jointly and tried together. In a case not cited by him ( *The Queen* v. *Solely and others*, 2 Salk., 593) it is said, by the court, that a riot is a " compound offense," to constitute which there must be an unlawful assembly of more than two persons. All, therefore, who unite or participate in it are principals, and jointly guilty of the offense. It is not, consequently, a matter of right to be tried separately for the offense, though the court undoubtedly have a discretion. If there is reason to believe that a party cannot have a fair trial—if mingling his case with that of the others may tend seriously to his detriment or prejudice—he should have a separate trial. There is nothing, however, in the affidavit of the defendant Judson to induce the court to grant him a separate trial. Nothing appears from which the court might infer that his rights would be affected, in the slightest particular, by trying him jointly with the rest. Nor is the deafness of the defendant Douglass, or his youth, a reason for granting him a separate trial. Whatever considerations may arise from

his youth may as well be addressed to one jury as to another.

The motion to put off the trial must also be denied.

The defendants have not shown due diligence. The trial of this case has been delayed for a long time; indeed, it has been delayed so long as to afford ground for public complaint. It is very different from the ordinary class of criminal trials. The transaction involved in it is more especially of a public nature. The great number of defendants of counsel and of witnesses distinguish it from other cases. It was set down, therefore, at the beginning of the term for a certain day, that ample time might be afforded to parties to get ready, and all parties were notified that it would be proceeded with to-day. The defendant Judson, having neglected to make an effort to get his witnesses with due diligence, if these witnesses were material, cannot now ask to put off the cause. He has not shown that the witnesses are material. He has not disclosed what he expects to prove by the two witnesses alleged to be absent.

It would be insufficient for the postponement of the most ordinary suit in a civil court, and is entitled to but little weight on an application, by a single individual, for the postponement of a case of this magnitude, when the parties, witnesses, etc., are so numerous. There should be a good, substantial reason either for postponing the cause or authorizing separate trials, which, in the opinion of a majority of this court, does not appear. For these reasons the applications for separate trials, as, also, to postpone trials, are denied.

The prisoners were thereupon arraigned, and each, through his counsel, pleaded *not guilty*.

Four days were spent in obtaining a jury. By the act of 1847 every person tried for an offense not punishable with death, or by imprisonment in the state prison for life, is entitled to challenge five jurors peremptorily. Under this act *Busteed* claimed that each of the prisoners was entitled to five peremptory challenges.

The *District Attorney* objected. He insisted that the prisoners were tried collectively for one offense, and that there could be on their behalf but five peremptory challenges altogether.

The court held that each prisoner under the act was entitled to five peremptory challenges. If this construction were not given, one prisoner might exhaust the five challenges and place it out of the power of the others to exercise a right which was manifestly designed for the protection of every individual who was put upon his trial for a criminal offense. It would in this case, from the number of persons upon trial, greatly increase the difficulty of obtaining a jury, but that was unavoidably incident to trying so many persons collectively for the crime of creating a riot.

The jury were then called. The first juror called was challenged to the favor, and triers were appointed. He declared that he believed that a riot had occurred on the night. of the 10th of May. *Smith* insisted that this disqualified him, as that was one of the questions to be tried. Judge DALY then charged the triers, who, after conferring together, found that the juror was competent, upon which he was immediately challenged by the defense peremptorily and set aside. As each juror was called, a challenge to the favor was interposed and tried. Each of the ten counsel exercised the right of interrogating the juror, of discussing the admissibility of the questions put to him, the great bulk of which were overruled by the court as irrelevant, but were again put as each new juror was called, and pertinaciously insisted upon in declamatory speeches designed to prejudice the jury against any trial of the prisoners at all. These occasions were so constantly taken advantage of for declamatory denunciations of the prosecution, and for commentary upon the rights of the prisoners upon political or popular grounds, that at last *Whiting*, on the part of the prosecution, made an energetic appeal to the bench, in response to which Judge DALY condemned the course of

the counsel, and in the course of his remarks characterized it as an abuse of the privilege of challenge, and so calcu-lated, if persevered in, to bring the administration of jus-tice into contempt.

*Mr. Smith* asked the judge if any of these remarks applied to him.

Judge DALY replied that what he said would apply to the counsel for the defense generally.

*Mr. Smith* retorted, that where rebuke was undeserved it was harmless, and he did not apply one word of all that had just reached his ears from the bench to himself; such reproof was as unjust as it was unmerited. So far as his conduct was concerned, he should pursue a fearless course. He should never quarrel with the law, but should defend the rights of his clients according to the best of his abili-ties, unawed by courts, counsel, jurors or witnesses.

Judge DALY remarked, in answer, that *Mr. Smith* was certainly correct in saying that rebuke was harmless if undeserved.

The constant interposition of irrelevant questions, of discussing their admissibility, the ruling upon them, the necessity of triers in each case to determine each juror's qualification, and the right exercised by each counsel to express his views to the triers upon the competency of each juror, led to a great consumption of time and greatly in-creased the difficulty of procuring a jury. The panel, though a large one, was exhausted on the third day, and the sheriff was ordered by the court to summon one hun-dred more by the following morning, to which the counsel for the defense objected, upon the ground that the court had no power, under the statute, except to order the addi-tional panel to be summoned in the same manner and upon the same notice as the first panel, which would have involved a delay of several days. The court overruled the objection, and the defense excepted.

On the appearance, upon the following morning, of a hundred additional jurors, *Smith* applied to the court for time to prepare the necessary papers to challenge the array. The application was refused, and the calling of the jurors was proceeded with as upon the previous days, and at a late hour, near midnight, a jury was obtained, and the following persons were impaneled and sworn :

1. Joseph Browner, 756 Greenwich street.
2. Cornelius Dewitt, liquor dealer, 135 Amos street.
3. David Page, public house, corner West and Hoboken streets.
4. Patrick Downey, tinsmith, 387 Grand street.
5. Robert Waterhouse, grocer, 51 Pitt street.
6. Charles Buckstone, grocer, 115 Amos street.
7. Wm. Browning, 364 Washington street.
8. Alanson H. Scudder, dry goods, 44 Hammond street.
9. Jeremiah Hawley, fruit merchant, 10 Fulton street.
10. Thomas P. Cooper, grocer, 103 East Broadway.
11. Gorham P. Taylor, grocer, 122 Monroe street.
12. David Newman, grocer, 81 Broad street.

On the opening of the court upon the fifth day *Sherwood* applied for a separate trial for the prisoner Matthews. The application was denied, and the court ordered the trial to proceed.

*Jonas B. Phillips*, assistant district attorney, opened the case, on the part of the prosecution, as follows :

Never, in the history of the criminal jurisprudence of this State, has a trial occurred which has created an interest so intense, profound and unusual as this. The prisoners are arraigned as the participators and, some of them, as the getters up of the fearful riot at the opera-house on the 10th of May last, the putting down of which, by a necessary resort to military force, has carried affliction and desolation to so many hearts and homes. *Mr. Phillips* gave the legal definition of a riot, as laid down in the books of authority, and then proceeded. It cannot be denied

that a riot existed, although, from the extraordinary course pursued in the impaneling of the jury, it is impossible to anticipate what will be insisted upon or called in question by the defense. The counsel then proceeded to state what the prosecution would show to prove the existence of a riot, and to establish the active participation of all the prisoners in it, and especially of the prisoner Judson, whom he characterized as the most prominent, and the one who was mainly responsible for all the blood that had been spilt, and for the lives that had been lost upon that disastrous and memorable night. You are, gentlemen, said *Mr. Phillips*, in conclusion, the conservators of the public peace, the guardians of the laws which have been violated, and upon the vindication of which depends the security of every man's person and property. You are here as the custodians of the rights of all classes of your fellow-citizens, who are anxiously watching the progress and awaiting the result of this trial, and when we have laid the evidence before you of the existence of the riot, and of the participation of every one of the defendants in it, the responsibility will be upon you to determine whether law and order, and the security that attends it, shall be maintained in the community or not. It will be for you, when we have put in our proof, and after you have heard what answer, if any, can be made to it, to say whether a riot existed, and whether all or any of the prisoners were unlawful actors and participators in it. When we have discharged our duty, we will leave it to you to say whether lawless violence and ruffianism can stalk abroad with impunity, and, in the spirit already exhibited at this trial, scoff at justice. To you justice presents her solemn scales, and we expect, as your fellow-citizens expect, that you will hold them with a firm, a steady, and an impartial hand.

### Evidence for the Prosecution.

All the facts relating to the riot, from the first manifestation of disturbance in the theater, upon the appearance of Macready, until the final suppression of it, with the aid of

the military, were minutely detailed by the recorder, Frederick A. Tallmadge, and by the several captains of police and policemen who were upon duty and actively engaged in preserving the theater from destruction; in frustrating the attempt which had been made to set it on fire, and in aiding to quell the riot; whose testimony collectively presented a clear and consistent narrative of what had occurred, as already stated in the history which has been given of the riot.

In respect to the prisoners, it was shown that Judson had written and published articles in his newspaper drawing public attention to the differences between Forrest and Macready.    That on the day preceding the riot he had avowed his intention to carry Forrest through, and that he afterward declared that he would be present to head the movement; that in the course of the day he told one of the witnesses that there would be a disturbance; that he considered himself as the leader of the native American party in the matter; that if Forrest was right he meant to see him through; that the witness told Judson that he had issues enough upon his hands, he thought, without interfering in this; that he, the witness, expected that there would be some hard fighting, and that he advised Judson to keep out of it, to which Judson answered, "That may be, but I mean to see it out."    He told his brother-in-law that one of the editors of the Courier and Enquirer, had applied to him to head the riot that was to occur that night at the Astor Place opera-house; that he had ascertained that the city authorities meant to call upon the military to support them, and that it was an outrage upon the rights of the people; that upon leaving his house that evening he had disguised himself in his brother-in-law's coat, armed himself with a pair of revolvers, and took with him what he called his brother's Roman sword; that he was asked why he had brought that with him, and he answered that it would make such a show; that when he came to the front of the opera-house he asked if there were any Americans there, and was answered by a young man that he was a Northern Liberty

boy ; that Judson then went up to a body of young men who were engaged in acts of violence, and said that he was Ned Buntline, and that that body wanted a nucleus ; that they did not act in concert, and suggested whether they could not get up the cry of fire, and that one of the young men who was acting with him answered that it would be difficult, but that the hooks and ladders were all ready ; that he said if they were there they could enter the opera-house by the back part and drive the audience out, and that he and the other then consulted as to how they could raise the alarm of fire ; that Judson proposed that they should get a lot of shavings together and set fire to them ; that after frequent conference with the young men by whom he was surrounded, who were engaged in throwing stones, and the number of which was constantly augmenting, Judson drew his sword, when, being told that one of the police captains was watching him and that he had better go home, he went away and gave the sword to his brother-in-law to take back to his residence, when, taking a revolver, he returned and again mingled actively with the rioters ; that he was heard to declare that it was a shame that Americans should be scared so, and one of the policemen testified that he appeared to be the center about which every thing moved. He was heard to call out, " Don't back down, don't back down," and to declare that it was the duty of the people to resist the military ; that he called out in a loud voice, "The ground is your own, and I will assist you in defending your rights," and was seen throwing up his hands, exciting the mob and calling out, " You need not be alarmed ; they have got nothing but blank cartridges ; " that he was arrested by a policeman, but afterward escaped in the confusion and tumult ; that he was followed, and was arrested again a day or so after the riot was over.

It was shown that Douglass had thrown stones and had been very active in assaulting the theater. Matthews was seen in the midst of the mob, and was heard to call out, " Fight, fight." By another witness he was seen with a stone in his hand in the act of throwing it, and had stooped

down and had taken another stone which he was in the act of throwing when he was arrested.

O'Neill was arrested with a stone in his hand, and while he was in the act of throwing it.

Green had thrown a stone and was arrested with another in his hand.

Adriance had been very active in the front rank of the rioters. He was seen to throw stones; to rally others together for the rescue of prisoners from the police, and was arrested while in the act of rescuing a prisoner, and with a paving stone in his hand.

Bennett was heard to shout, "Victory! victory!" in the struggle with the police. It was also shown that he wore a policeman's star, and was seen swinging something over his head, which the witness could not see distinctly, but which appeared to him to be a weapon.

Norris and McLaughlin were both seen in the act of throwing stones at the theater, and Hosack was seen to throw stones at the theater and at the military.

The witnesses on the part of the prosecution were subjected to such protracted and annoying cross-examinations, on the part of several of the counsel for the defense, as to lead them frequently to appeal to the court. The counsel for the prosecution repeatedly remonstrated, and called upon the court to check the course of the cross-examination and protect the witnesses. This was especially the case during the cross-examination of the witnesses who proved the complicity of Judson.

One of these witnesses, John McChesney, an acquaintance of Judson, testified that he had had a good opinion of him until he witnessed his conduct in inciting and directing the riot, when he experienced a great revulsion of feeling toward him. This remark, and the clear and consistent account which this witness gave of the acts of Judson, especially while conspiring with and directing a numerous body of young men with whose acts the riot in the street commenced, caused the witness to be subjected to a long cross-examination on the part of Judson's counsel, the effect of

which was to strengthen instead of weakening the witness' testimony, and during which the counsel frequently indulged in comments and reflections upon the motives and character of the witness, which was carried to such a length that the district attorney appealed to the court.

Judge DALY said that these comments and reflections upon the witness could not be allowed; that the witness stood unimpeached before the court, and that there was nothing in his replies to the questions put to him, which had been uniformly direct and clear, that justified any such remarks upon his motives and character; that the court would not suffer the counsel to browbeat and intimidate a witness in this way. Your client, Mr. Smith, said the judge, shall have a fair trial, but it shall be a thorough and a full one, and no effort on the part of counsel would or should prevent competent testimony from being elicited.

*Smith* appealed to the full bench to know if the implied censure of Judge DALY was just as to him.

*The District Attorney* asked if the counsel for the defense were to be allowed to poll the bench in this way. The counsel had, no doubt, some private reason known to himself for doing so.

Judge DALY, after conferring with his associates, said the majority of the court, himself and Alderman Wood, agreed that the course of the counsel justified and demanded, on the part of the court, the remarks which had been made, but that his remaining associate, Alderman Kelly, thought otherwise. Alderman Kelly, from the commencement to the close of the trial, dissented from every ruling of the court which was made upon consultation.

After the opinion of the majority of the court had been expressed, the foreman of the jury rose and said, that he desired to say, for himself and for others upon the jury, that no court or jury had ever, in their opinion, been so abused

and insulted as upon this trial. *To Mr. Smith.* Yes, sir, you have grossly insulted and trifled with us ever since the trial commenced.

*Smith:* The only reply that I have to make is, that you, and any who agree with you, are unfit to sit upon a jury.

Another juryman rising, said, "You utter, sir, what you know is not true."

*Smith* appealed to the court.

Judge DALY: You have brought it upon yourself, Mr. Smith. The court will not interfere. If you are through with the witness, let the next be called.

Walter Corbyn was next called, and testified that he had a conversation with Judson a day or two before the riot, respecting what would occur at the opera-house upon the night of the 10th.

*District Attorney:* Will you now begin and tell us the time of day, conversation and circumstances?

Objected to by *Smith.*

*District Attorney:* State, then, the conversation had with him there?

*Smith* objected, first, that no riot had been proved; and, secondly, that the prosecution had no right to go into a conversation with defendant several days before the riot, if there had been one.

*Whiting* replied, showing that it had been proved—first, that all the defendants were there; and, secondly, that a riot within the definition of the statute had most palpably occurred; and went on to show that the evidence was admissible.

VOL. XI—3

*Smith:* This is an unwarrantable assumption, and *too monstrous* to notice. It is, in effect, saying, that all persons present with a multitude, which originally met for proper purposes, are guilty of riot because present as spectators, merely.

The judge and district attorney said that no such proposition was before the court.

*Smith:* It is, virtually; and if the court will not stop me, and interrupt me in my arguments, I will go on and complete my argument.

Judge DALY: The court would not interrupt counsel if it were not necessary.

*Smith* rejoined, that he had become callous to the rebukes of the court, he had received so many, and said something about out-door influence as controlling the court.

Judge DALY stopped the district attorney, and said—That it was true that a prisoner's declarations, showing an intent to commit a riot, could not be given in evidence until there was general evidence of a riot and some evidence showing that the prisoner had participated in it. He said he had supposed that counsel familiar with the events of the night of the 10th May would scarcely have insisted that there was no riot in contemplation of law, and that in view of the general notoriety of the circumstances, and the fact that they could be attested by a host of witnesses, he had supposed that the counsel for the defense would admit the fact. If the existence of the riot was a matter of doubt, or if it were difficult of proof, he could perceive the motive for such a course. But it was upon a par with the whole course of conduct that had characterized the defense. The affidavit of the prisoner, Judson, had been read to the court, in which he solemnly swore that he went to the opera-house as a reporter, and had nothing to do with the attempts at vio-

lence; and when this affidavit is found to be wholly inconsistent with the shape that the defense is now made to assume, the court are told, that as this affidavit was read before the impaneling of the jury, upon an application to put off the cause, the court must regard it as out of the case and draw no inference from it. I tell the counsel and his client that this flimsy distinction will not avail them. If this affidavit be untrue, it is not in their power to purge the recorded lie. It was read in the hearing of every juror now impaneled, and has been given to the world through the means of the press, and if the defendant Judson supposes that the court and jury can dismiss the fact from their mind, if it should conflict with the defense he proposes to set up, then he has but little acquaintance with the nature of the human mind. But for the purposes of this testimony, it is unnecessary to go into further evidence of the existence of the riot or of Judson's participation. Both sufficiently appear from the evidence before the court. The witness Tilley swears he saw him advising and consulting with those who were engaged in throwing stones at the theater; that he heard him say, "Now, boys, for another shower before the military comes." This was not, in legal contemplation, inciting to a riot. It was acting in it, guiding and directing it after it had begun. It is not necessary that a party should do some physical act, such as throwing a stone or knocking down an officer. If he is busy, while the riot is in progress, in guiding and directing and stimulating others to acts of violence, he is as guilty as the instruments he puts in motion. Of the riot itself there is abundant evidence; evidence that the theater and the police were assailed; evidence that those engaged in throwing stones were, in the language of the witness, wild with excitement. An ample foundation, therefore, had been laid for the question. The judge, in conclusion, said that what the counsel had suggested about out-door influence was scarcely entitled to the dignity of a reply. There were some insinuations that were sufficiently rebuked by the majesty of silence, and if this one affected the law member of the court alone he would

have left it to perish upon the lips that uttered it. But he was here as the mouth-piece of the whole court, and, speaking as their organ, it was due to them to say that neither private influence, nor the influence of the press, nor the united influence of public opinion, would weigh aught with this court when the question before them was the guilt or innocence of a party accused. They were here to see justice administered, even and exact justice, and it should be administered equally to all. They would allow no influence, however powerful, to deprive a freeman of the rights guaranteed to him by law. They hoped they would never be found wanting in sympathy or a proper feeling of humanity toward those who stand accused of crime. It was the duty of the court to watch over the innocent, and they would admit every thing that might tend to establish the innocence of an accused person. At the same time they would not permit ingenious counsel, by technical obstacles and sophistical distinctions, to baffle justice, as long as the court was gifted with the intelligence and the power to prevent it. In making this remark the court wished to draw a distinction between the respective counsel for the defense, and did not extend this remark to all. It was unnecessary to particularize, as the distinction could be readily drawn. It was proper to say that there was an inherent difficulty in the trial of so many persons together, and in their appearing by so numerous an array of counsel. That difficulty was augmented by the recent act of the legislature, giving the right of peremptory challenge in cases of misdemeanors, the reason for which it is difficult to divine, and the injurious operation of which was apparent in the attempt to get a jury in this case. Three days were spent, and mainly spent in the abuse of the privilege of peremptory challenge. Jurors were rejected who were miracles in point of qualification; and, I suppose, no jury ever sat in box who have passed through a severer test than the jury in this cause. The defendants have obtained an impartial jury, if ever an impartial jury was impaneled, and they shall have an impartial trial, so far as the power of the court extends.

Some of the counsel for the defense deport themselves as if they were the only parties who had any interest in the result of the trial, and as if every facility should be afforded them to enable them to acquit their clients, whether innocent or guilty. Indeed, it would seem as if the court, and not the prisoners, were upon trial. As the proof accumulates, the more uncontrollable becomes the counsel. If this could be tolerated, the solemn nature of a public trial would be converted into a mockery and a show. There is necessity for a change; and the court will not stop at the mere uttering of complaint. If any gentleman of the bar has not in himself that instinctive perception of what is due to public magistrates—of what is due, not to them as individuals, but to the station they temporarily occupy—if he is so far insensible to what is due to the dignified administration of justice as not to keep within the limits of a respectful and decorous restraint—all that I need say is, that the court have the power, and they will compel it.

The court admitted the question, and with the examination of this witness the evidence for the prosecution was closed.

The question then arose as to the manner in which the ten counsel were to open the defense of their respective clients.

Judge DALY said they might open their respective defenses to the jury in the order in which the prisoners were named in the indictment, or in any order which they might agree upon among themselves, and whatever order was pursued in the opening would have to be pursued also in the summing up. The judge further suggested that, if they preferred, some one of the counsel might open the defense to the jurors generally, and the others before they proceeded to call the witnesses to prove their respective defenses. It was finally arranged that each counsel should open before he proceeded to call his witnesses, and in the order in which the prisoners were indicted, and that course was followed.

### EVIDENCE FOR THE DEFENSE.

As one of the principal witnesses examined by the prosecution to prove the complicity of Judson was his brother-in-law, Bennett, a witness was called to show that Bennett was influenced to testify against Judson in consequence of difficulties existing between Judson and his wife, but this witness admitted that Judson had sent the witness to Bennett to settle all differences between them, and to tell him that if he would not come voluntarily to testify against him, that he, Judson, would not publish him and his family in his newspaper. That he was told to tell Bennett that he could easily leave the city if he did not wish to appear against him, and that Judson had said to him that if Bennett did not agree to decline to come forward, he would not go on with the trial, and would have to get it put off. That the witness told him that he felt certain that Bennett would be called as a witness, and that Judson said he thought not unless he came forward voluntarily himself. · One or two other witnesses were examined, who testified that they saw Judson in Astor Place, and that he was not doing anything, and another witness that he had asked him at his house at 7 o'clock if he would go to the opera-house, and that he answered that he could not; that his wife was sick; that if he went out of the house at all he would have to go to his lawyers upon business; that if there was a riot it would be a disgrace to the city; that he was opposed to all riots, and was opposed to the riot which occurred in the theater upon the first appearance of Macready. On cross-examination it was shown that the witness was a journeyman printer in the office where Judson's weekly paper was printed, and a member with him of a secret society. Two other witnesses were called, who testified that they saw the riot throughout, and every thing that occurred, but did not see Judson there at all. Another witness, Potter, was called, who stated on the direct examination that Bennett, the witness, had said that he would be justified in shooting Judson for what Judson had said of him in his paper; but on the further examina-

tion of the witness it appeared that Bennett's father had said that Potter, the witness, would be justified in so doing from what Judson said of him, and that he, the witness, and young Bennett added, "yes."

On behalf of the prisoner Thomas Bennett, a witness was called who swore that Bennett was arrested while in the act of picking up a policeman's star which he found in the street; that the witness was at the prisoner's side at the time; that it was twilight before any stones were thrown, or any act of violence committed, or the riot in the street had commenced. Two other witnesses testified in part to the same effect, and others were examined to disprove his identity with the one who was heard to shout "Victory!" and was seen throwing stones, and several witnesses were called who proved his previous good character.

On behalf of Matthews a witness testified that he went to the opera-house with him and was with him for three hours; that he was quiet, and was merely looking on; that he neither shouted nor threw stones, and that the witness left him there when the military came. Matthews' brother testified that he was also there with him, and that the prisoner told him to go home and to keep still.

In Douglass' case two witnesses testified that they were with him the whole of the evening until they were separated by the crowd about nine o'clock; that he took no part in the disturbance, and said, in the course of their conversation, that he did not see why Macready had not as good a right to play as Forrest; and a number of witnesses were called and testified that he was quiet and inoffensive in disposition, was very deaf, and bore an excellent character.

In Adriance's case the testimony extended only to very satisfactory proof of his previous good character, and an attempt to show that he had been confounded with some other person, but the testimony was too slight to counteract the evidence of the policeman who arrested him with a stone in his hand, while he was attempting the rescue of a prisoner.

In Green's case the witnesses called failed to establish

any thing except his previous good character, and it was the same in effect in the case of O'Neill, who was shown, upon the direct, to have been one of the most active in the front rank of the rioters.

The testimony in Hosack's case was designed to show that he had been confounded with the person who had been seen throwing stones at the military, and a large part of it consisted of the degree of darkness, the distance at which objects could be seen or persons identified, the exact period of time at which certain events occurred, and proof of the difference between the prisoner's dress and appearance that night and that of the person who was assailing the military, together with evidence of his previous good character.

## SUMMING UP FOR THE DEFENSE.

### E. BLANKMAN'S SPEECH.

He commenced by dwelling upon the misfortune which his client, Thomas Bennett, was under in being tried with nine other defendants, in which he had to share in and bear all that was said against them or any of them as rioters; in which he might suffer from the testimony relating to him being confounded with that against the others; in which it might be difficult to discriminate between what was urged and proved upon his behalf from the whole mass of the testimony. This was the difficulty and the injustice of putting him upon trial with a number of others, and leaving him to take the chances of his case being discriminated or not. He dwelt at length upon what occurred, speaking of it as the natural ebullition of popular rights and American feelings, where the authorities would permit an obnoxious actor to perform, and where there was no other way for the people to prevent it but to arise and assert their rights. It was not the people, but the military and the authorities, who were answerable for what had occurred. He insisted that his client had not been identified, that the witnesses were mistaken, and continued as follows:

The cause has now assumed that solemn feature when it

People v. Judson.

is about to be consigned to you for your final deliberation. It is a question grave in its nature and serious in its character; it is one which, allow me to remark, involves, not the liberty only of one of these defendants, Judson, at whom this prosecution is more particularly aimed, but the liberty of eight unfortunate defendants; unfortunate, permit me to say, not that they are guilty of the crime for which they stand indicted—their innocence has been too plainly established by the evidence adduced in the course of the trial—but, gentlemen of the jury, you cannot close your eyes to a painful truth, that the eight defendants last named in this indictment are only joined in the prosecution in order to secure the conviction of the defendant Judson. This, indeed, is a startling feature in this cause, which cannot be passed over without comment or remark from the counsel for the defense. It is a matter of deep and earnest consideration for you, gentlemen of the jury. It is not necessary at this stage of the case to picture to you the awful tragedy which was enacted at the Astor Place on the night of the 10th of May last. A scene, allow me to say, which tends to add to history a page written in human blood, an occurrence which is yet so fresh in your recollections, needs but little comment; but this is not to bias your minds in judging of the guilt or innocence of the defendants. The only legitimate question for your consideration is, whether these defendants participated in the riot. You are not to ask yourselves the question whether Mr. Judson is on good terms with his father-in-law, or not. That has nothing to do with this case. It does not seem proper that Mr. Bennett, the father-in-law of Judson, should come into this court and ask you, gentlemen of the jury, to consign innocent men to the penitentiary in order to satisfy his great appetite for revenge upon poor Judson, who has been "more sinned against than sinning." We asked to be tried alone, and it was refused us. The prosecution knew, and it is known in the community, that they only desired to convict Judson for offenses committed against his father-in-law, Bennett. In deliberating upon your verdict you

should use the same degree of care, of caution, and of discretion, as though the issue were of life and death; for every defendant which you, by your verdict, declare guilty, stamps him in the eyes of men with a crime of the deepest dye; for which among you would not look upon the man who is guilty of originating or of participating in this wholesale slaughter, on the night of the 10th of May, as morally, if not legally, guilty of murder, and if not answerable to the laws of his country, at least he is to his God? To convict an innocent man of this crime would be doing an injury to him which the acts of a whole life could not wash away. It is not the weight of the corporal punishment which the law inflicts upon these defendants of which they need complain, if by your verdict you convict them, but because the four walls of a prison-house would then be no asylum for them. There they would find no refuge to screen, to hide, or to protect them from the finger of scorn; their punishment would, in fact, commence after the term of their imprisonment had expired. Then it is too late; a cureless wound would be inflicted for which "there is no balm in Gilead; no physician there." Then it is that life would become a burden and the world a waste. Mr. Blankman continued in a speech of about two hours to address the jury, endeavoring to prove to them, from a review of the evidence adduced on the trial, that his client was not culpable of the charges alleged against him.

### JOHN D. SHERWOOD'S SPEECH.

*Mr. Sherwood*, in defending Matthews, said: That in defending one of those accused of riot, it was neither within his line of duty as counsel, nor did it conform to his convictions as a citizen to defend the tumult of the 10th of May. He stood there, amid the counsel of defense, as Matthews stood on the eventful 10th, with a stone in his hand, not to assail the opera-house or the constituted authorities, but to defend that which was dear to his client then, and no less dear now, his person and his liberty. He charged the prosecution with unnecessarily and cruelly joining the

People *v.* Judson.

accused in one trial, and accused them of causing, by this act, the delay which they have sought to fix upon the defense. The defense had offered, as a condition of a separate trial —separate especially from Judson—to admit the facts which it had taken a week to prove. He then went into a review of the rights of individuals at public meetings; showed that their free exercise was a consequence of political freedom, and was attended with safety to the country, and that it ought not to be abridged by such doctrines as the prosecution sought to establish. He denied that persons are accountable for all that occurs at a public meeting, and insisted, as a position of law: 1. That the offense of riot, like every other offense, consists in the intent, and that every individual is to be judged by his own acts alone. 2. That mere presence at a place of riot does not, in itself, constitute the person a rioter.   3. That under the proof in this case—proof of the presence there of peaceable persons— their presence at Astor Place was no ground for the presumption of a riotous intent.   He enforced these positions by a variety of reasons, and by citing authorities: Sir Matthew Hale, Lord Holt and Lord Mansfield.

Judge DALY said that it was necessary, in order to charge a person as a rioter, to show some participation on his part in aid and support of the riot, and that being shown, he becomes liable for all that takes place.

*Mr. Sherwood:* Does your honor mean to say that if Matthews, for example, had been proved to have uttered a single cry on that evening that he would have made himself responsible for all that subsequently occurred, even after his arrest and confinement?

Judge DALY: Yes. If uttered with the intent to incite and encourage others to acts of violence and riot, and if such would be its natural effect.

*Mr. Sherwood:* Then we live under a worse than ori-

ental despotism.   I have seen on the banks of the Nile, and
in that country alone, whole villages held responsible, and
absolutely decimated by a despotic pacha for the acts of a
single man; but I did not suppose that we had adopted
the Egyptian code here.   Under the bloody law of war the
butcher Haynau had proclaimed, to conquered Pesth, that
every inhabitant should be held responsible for the acts of
every other; but I have now to learn that we are to be sub-
ject to such a practical despotism here.   *Mr. Sherwood* then
reviewed the facts in the case of Matthews, and insisted
strongly upon his innocence, from a variety of considera-
tions.   He contended that he was only acting as an Irish-
man in self-defense; that the stone found in his hand was
caught up in the moment that the mob was pushing upon
him, to be used only for his own protection.   He taunted
the prosecution with an attempt to satisfy public expecta-
tion by the sacrifice of a few thoughtless boys, while the
real heads and chiefs of the riot were suffered to go at large
from fear of their political influence or power.   The public
prosecutor might portray before them an organization ever
so complete to destroy the laws; he might look from the
chaos of night, like Milton in his description of the creation,
and see horrid shapes—

> " The tawny lion, springing to get free
>   His hinder parts—who springs,
>   And rampant shakes his brindled mane."

But the public would hold him to the responsibility of
producing the heads and chiefs of this outbreak, instead of
innocent spectators acting in self-defense.   He concluded by
an appeal to the jury to uphold the law, by discriminating
between the innocent and the guilty, and to rebuke the
prosecution for this attempt to delude and cheat public
justice.

*Mr. Boudinet*, counsel for Hosack, next appeared before
the jury in behalf of his client.   His points were:

1. That Hosack committed no riot; he used no violence
until after the first firing of the military.   2. That the

indictment charges an assault and battery.   *Mr. Boudinet* claimed that where the prosecution alleged an assault and battery in their indictment they must prove what they have set forth, else the accused must be acquitted.   3. That in order to convict a party of riot the prosecution must establish by proof the premeditated action of the accused, with two or more persons.   Upon these grounds the counsel for Hosack insisted that the prosecution had failed, and he claimed an acquittal for his client.

*Mr. Cornell* next addressed the jury as counsel for Adriance.

He claimed that his client, according to the proof, was dressed differently from the person sworn to by the officers, and his argument was directed to maintaining that the person whose acts were detailed by the officers was not his client.

*Mr. Busteed,* on behalf of George Douglass, followed, and in his remarks said, that in the course of the trial motives had been attributed to him which would disgrace a Hottentot.   The court interrupted him, and asked to whom he meant to apply the remark; if he intended to apply it to the court.   Mr. Busteed said he did not, and proceeded with his argument.   He came in pretty close collision with the court once or twice during his summing up, but always disclaimed any intention to offend the court.   Mr. Busteed claimed that the good character of his client precluded the idea of his guilt; and, besides, that his deafness and his youth ought to appeal to the sympathies of the jury, although not on account of his deafness or his youth did he ask his acquittal, but upon the ground that no riotous intent had been proved against him.

*Mr. Schell* addressed the jury on behalf of Thomas Green. He said: That in order to convict his client, it must be proved first, that a riot occurred before his client was arrested, and, secondly, that Green was an active partici-

pator in the riot. He maintained that it had not been proved that any riot occurred until after Green was arrested. The counsel went into a careful review of all the testimony which related directly to Green, and said that there were such discrepancies in the testimony of the policeman, Mc-Manus, that it was not reliable ; that the jury, in considering it, must exercise great caution ; that it involved a serious doubt, and Green ought not to be found guilty upon such testimony.

*Mason* spoke briefly for McLaughlin.

*Mr. Morrison*, counsel for James O'Neill, was the next to address the jury. He said he had no quarrel with the court; on the contrary, he approved throughout of the course of the presiding judge ; nor had he any fault to find with the prosecuting counsel : he did not dispute, nor had he, that there had been a riot. All that he claimed he would undertake to show was, that O'Neill, his client, had been mistaken for somebody else. He was there, but simply as a spectator. His companion, Dutch, was with him, until he lost him in the confusion. Up to that time he had done nothing, nor taken part in any way in the riot. He was seized by the police, as no doubt were many other quiet lookers on, in the confusion and excitement that existed. .This was shown by the fact that a number were arrested against whom nothing could be found. No doubt Savage, the policeman, believed him to be the person whom he saw taking an active part in front of the mob, whom he arrested with a stone in his hand, and who made the declaration, after his arrest, to which Savage testified. Savage came next day to the station-house, and, finding O'Neill there, identified him as the person he had arrested upon the previous night. But he might easily be mistaken, and he was mistaken. He admitted, upon his cross-examination, that there was no light except star light, and that it was pretty dark all about when he arrested the person he afterward supposed to be O'Neill. Gray swore that he could not distinguish a person with

whom he was acquainted at the distance of seven feet, it was so dark; that he could identify no person. Savage was clearly mistaken. O'Neill was there and was arrested, as were many other innocent lookers on, but it was his misfortune, the next day, to be mistaken for somebody else. He was a quiet and peaceable young man. This was proved by the foreman of the shop in which he worked, and he and other witnesses had given him an excellent character. He urged strongly for his acquittal.

When all the other counsel had closed, *Smith* rose and moved to quash the indictment.

*District Attorney :* It is irregular to move to quash the indictment now, after all the evidence has closed, and all the counsel except Mr. Smith have summed up to the jury.

Judge DALY: Ordinarily a motion to quash the indictment should be made before a prisoner enters upon his defense, or before any evidence is given. But it is a matter entirely in the discretion of the court. If the indictment is defective, a prisoner may, after conviction and before sentence, move upon that ground in arrest of judgment, and, as this is a joint indictment, the granting of such a motion as to one would, in effect, be granting it as to all. As this trial has occupied more than two weeks, and as a motion in arrest, for this reason, may be made, if the prisoners or any of them should be found guilty of the offense charged, it would be an economy of the public time to grant the application to quash the indictment now, if there is any ground for it, and I will therefore hear the motion.

*Smith* moved upon the grounds:
1. That the indictment is defective because it does not aver for what purpose the rioters assembled, and cited *Rex* v. *Ingram*, 1 Ld. Raym., 215; *Rex* v. *Sudbury*, id., 484.
2. It is defective in not averring that the act was done to the terror of the people, and he cited 1 Hawkins' Pleas of the Crown, 295; 1 Russell on Crimes, 267.

*District Attorney:* The form of the indictment in this case has been in use for many years. It was prepared by one of the most learned and eminent of my predecessors. It has stood the test of trial, defended by the most eminent criminal lawyers of this city and State, and if it wanted any thing that was material, or there were any fatal defect in it, it would not have been left for the counsel in the present case to discover.

Judge DALY: If the indictment were defective in the matters stated it would be a subject for serious considera- tion. But it is not. It is very carefully drawn and con- tains all the averments that are essential. The motion will, therefore, be denied.

It was then arranged that Mr. Whiting should sum up on behalf of the prosecution, that Mr. Smith should follow him, and that the district attorney should close.

### JAMES R. WHITING'S SPEECH.

The time has now come, gentlemen of the jury, when the prosecution is to be heard. The counsel for the defense declare that their clients have been selected as victims to appease the violated law. That some, or at least one, of them has been selected, because there were strong preju- dices against him, and that, consequently, it would be an easy thing to make him a victim. After the evidence that has been given, it would seem, from the earnest appeal made to you on the part of some of the counsel for the defense, that you are to shut your eyes altogether to the evidence. That you are to recognize that we are not living under a government of law, but in a community where any one may make use of the bowie knife to redress real or imaginary wrongs; or where any number of men may get together, and, as a popular or political right, put down by violence whatever they think proper, destroy whatever they please, and put in jeopardy any man's rights, life or prop- erty. You are repeatedly urged by the counsel for the defense not to give way to excitement. Why, gentlemen,

People *v.* Judson.

who are excited? You are not excited; I am not excited. It is these defendants who are excited, for having brought down upon themselves the indignation of every good citizen, for those lawless and inexcusable acts on their part, which had their natural result in scenes of bloodshed, involving the loss of twenty-three lives. They may well be excited on the attitude in which they stand before their fellow citizens, as the originators or active agents in a mob so causeless, and to quell which led to the necessity of sacrificing so many lives. Now that they are arraigned before the bar of justice to answer for this crime and its fearful consequence, they and their counsel may well feel concerned, having no excuse to offer, and nothing, in fact, to say to the evidence against them, except through their counsel, to waste hours of the time of the learned court and of this jury by going back to English authorities, and citing from my lord this, and my lord that, to show what is necessary to constitute a riot, in the forlorn hope that they may get the court or the jury to come to the conclusion that there was no riot. Are they endowed with common sense? Do they suppose that there is any man upon this jury, or any man, woman or child in the city, who doubts that there was a riot and a fearful riot; a riot that has convulsed the whole community? It is known to the whole nation, and is, in its consequences, without a parallel in the past history of this city; indeed, I may say of the nation. Why, then, this idle parade of legal authorities? This reading of, and commenting upon, cases? Simply because they can do nothing else, and they do this in the idle hope of confusing the court or of bewildering the jury; do it in the vague expectation that the court or the jury might possibly come to the conclusion, that, although there was a fearful riot in fact, there was none in law. What is a riot in law? I will give it to you in plain language.

*Mr. Whiting*, in simple language, divested of law terms, here proceeded to tell what was a riot. Every tumultuous assemblage in the streets, consisting of three or more persons, he said, having a definite object of a private nature to

accomplish, and joining to accomplish that object, they were rioters. If they all act in concert to accomplish one object, it is sufficient that their acts all tend to the accomplishment of the object. The object must be of a private nature, because, if it is against the government, it is treason. Now, gentlemen, as I intend to be very brief, I shall proceed to inquire into the evidence. First, let me speak of the remark made by Mr. Sherwood, counsel for the defense, that his client, and others of these poor boys, were made the sacrifices, while the real ringleaders, who were also prominent party leaders, were allowed to go at large. A more gross calumny could not be uttered by the lips of a human being. *Mr. Whiting* here passed a high eulogium upon Mr. McKeon, in his character of public prosecutor. Ought party to be adverted to? he asked. It is true we belong to different political parties; but do we not all belong to one common country? Mr. Macready was advertised to play in that theater, and he had a right to play there, and Mr. Forrest or his friends had no business to interfere to prevent it. If representations of this kind are to be put down, they must be put down by law, and according to law; if Mr. Forrest, or his friends, have been instrumental in the violent measures pursued there, and if any good citizen knows of any fact which goes to prove their instrumentality, they ought to make it known to the proper authorities. One of the learned opponents has called Mr. Macready a mountebank. This was in bad taste. Mr. Macready loved our institutions, and was about to bring his family here to educate them. Those were unfortunate circumstances, which caused the death of so many human beings. And out of the seventy or eighty persons arrested on that night, these ten or twelve persons were all that could be recognized the next morning. Every man who was there, encouraging the mob, was guilty of committing a riot. The man who sat in a public house, at the lower end of the Park, and gave advice as to the conducting of the riot, is equally guilty, if such a thing could be proven against him. We have seven persons here be-

sides Judson. Bennett was arrested with a stone in his hand, uplifted. He aided or encouraged the rescuing of some of the prisoners. His own witness proves that he had the stone uplifted. It was after the police had been assailed and driven in. What was his conduct? Was it that of a peaceable citizen? No, gentlemen, he was engaged as a disorderly person. James Matthews is also arrested while throwing a stone. Hosack was seen to throw a stone. I care not at what it was thrown; it was in violation of the public peace. Adriance was seen to aid in the rescue of a prisoner from an officer. The guilty never suffer more than the innocent. Do these young men suffer equally with their relatives? Does the disobedient and profligate son suffer with his afflicted parents? I take no issue with the gentlemen on this point. Now, as to Douglass, he is fifth on the list. Much has been said by counsel for his poor, deaf client. Now, if he is so deaf as his counsel would have us believe, I cannot see what should have called him to the Astor Place. He was in the neighborhood of persons who were crying out, "fight! fight! fight!" and a stone was seen to drop from his hand. The evidence is so abundant that we can dispense with half of it, and have enough left; and I am not anxious that they should, any of them, be convicted. The next defendant is Thomas Green; he said he had been inside, and they would not let him in again, and he would be damned if he wouldn't have satisfaction; and so he was found with sand and stones in his hands taking satisfaction. *Mr. Whiting* here reviewed the testimony applicable to Green. In relation to O'Neill, it has been urged that he was throwing stones in self-defense. Now, I apprehend that there was no necessity for any person to throw stones in self-defense that night; if he was assailed, why did he not leave? In relation to Adriance, the officer is said to have given him a wrong dress. Now, there is nothing so difficult as to identify persons by their dress. The officers have been exceedingly cautious, as is seen in the fact that only some twelve have been identified out of the seventy or eighty who were arrested. The

night was a dark˙ one, and it was extremely difficult to see
and identify persons at a distance ; but the persons arrested
in the: dark were taken to the light—seen in the light—
recognized by the light. In relation to the comparative
guilt of the defendants, Mr. Whiting stated to the jury that
the court could discriminate in apportioning the punish-
ment. These riots must be put down, or we shall have a
Jeffries or a King—perhaps a King John—to rule over us.
Now, gentlemen, in relation- to Judson, who "threw no
stone," who committed no riotous act ; a man who contem-
plated this scene four and twenty hours before it took place
—who pre-determined that he would be there as the leader
of the native. American party, and, in accordance with this
determination, arms himself with this sword [shows the
sword], a sharp two-edged sword, and revolvers ; and yet
this man spreads his editorials before the community pre-
ceding the riot. Armed to the teeth, he seeks that riot—
he plants himself on the sidewalk—he gives directions—
and yet, I suppose, his counsel will ask for his acquittal.
Out of the mouths of seven witnesses do we get evidence ;
he is proven to have said, "It is a shame that Americans
should be used so." He knew the warm blood of these
young Americans. We have it in evidence that one of
these boys said, after just speaking to Judson, "Now, boys,
for a shower." Judson said again, that whatever was done
must be done quickly, as the military were coming. But
the police could have arrested Judson had he been alone.
What does Judson tell Mr. Corbyn ? Why, just what he
did on that night. He said he was going there, and was
going to see it out. He did go there ; but he did not see it
out. But what else does the diabolical ingenuity of E. Z.
C. Judson conceive? To raise a cry of fire. The hooks
and ladders are all ready, but " we can't raise a cry of fire,"
says the Northern. Liberty boy. What says E. Z. C. Jud-
son ? Why, "get shavings and set them on fire ; this will
bring the hooks and ladders, and we can scale the walls
and get into the second story and drive them out." Such
a man, gentlemen, is fit to enter your house at night with

stiletto in hand. What would he not do? If Mr. Judson had exerted the power and influence he might have done— if he had said, "You are all wrong, go home, the military will be here and fire upon you;" if he had exerted the influence he might have done, there would not have been a stone thrown from where he stood. But where is the redeeming point in all his conduct? There is evidence enough to convict him, even without the testimony of young Bennett; but of that testimony let me say a word. You saw him on the stand: his evidence was simply given, and goes to prove the cunning and adroitness of the accused; you heard of Mr. Marcus Cicero Stanley, his friend and coadjutor in the newspaper, who was present to relieve him of his pistols, which, if found upon his person, would have been damning evidence of his guilt. But where was Marcus Cicero Stanley when we wanted him and said we could not find him? Judson's counsel replied that we need not trouble ourselves, that he intended to introduce him himself. Where is he? [*Mr. Smith*—He has not yet returned.] Well, now, as to the paper—(reads the article in the paper Ned Buntline's Own, published on the morning of the 10th of May,)—"This is a piece of his jesuitism," said *Mr. Whiting*, in writing this paper, when he was about to engage in the deeds of that night. There is a species of refined cruelty about the man who would sit down and write thus, and then engage in the scenes where missile after missile, stone after stone, was thrown; broken doors, broken windows to be seen, he crying, "Don't give it up, boys!" The people out of doors are quietly looking on at the peaceful administration of justice within these walls; if these defendants are innocent, acquit them, but if guilty, convict them; and thus give evidence, not only to those around you, but to those on the other side of the Atlantic, that we can not only carry on war at home or abroad, but can maintain order by pointing the bayonet and sword at the disorderly peace-breaker in our midst. I thank you, gentlemen, for your patience, and I submit this case, so far as I am concerned, into your hands.

*Mr. Smith* then addressed the jury on behalf of Judson. He spoke for about five hours, but no portion of his remarks appears in the printed accounts of the trial in the public journals.

### THE DISTRICT ATTORNEY'S ADDRESS TO THE JURY.

*The District Attorney (Mr. McKeon)* then addressed the jury:—May it please the Court. Gentlemen of the jury, the moment has at length arrived when it becomes my duty, as the representative of the people in this investigation, to present such views, as in my judgment, should induce you to render a verdict against the prisoners now at your bar. The many days consumed in this trial should admonish me to be brief in any remarks which I may offer. Fortunately, the ability of my associate, in his lucid argument, has relieved me and you from a very extended discussion on my part. You will believe me, gentlemen, when I assure you that nothing but an imperious sense of duty would induce me to trespass on your patience, fatigued and worn out as you must be by the severe ordeal you have been compelled to submit to. The case, so simple in its nature, has been mystified to that degree, that your minds have been drawn off from the real questions involved in the issue between the State and these defendants. My object shall be to endeavor to lead back your attention to the only question really submitted to your consideration— the participation of these defendants, or any of them, in the riot of the 10th of May last, at the Astor Place Opera House.

The occurrence of that night is part of the annals of the country. It is written in characters of blood, and will remain forever on the page of our municipal history. Into the causes of that disturbance you are not impaneled to inquire. You are not to inquire into the merits of the controversy between two distinguished tragedians. You are not sworn to inquire whether or not proper measures were made use of for the prevention or suppression of the riot. You have been told that the authorities should have

closed the theater to prevent the disturbance. I have here but one word to say in answer—that had that been done, the spirit of mob-rule would have been triumphant; had that doctrine been adopted, the lawless bands which infest this city, and known to every one connected with the police, would have dictated terms to your fellow-citizens. Let this be the principle on which we are to act, and what will be the consequence?—that every man's business will be carried on at the mercy of the mob. The lessees of that building had paid the license required by your laws, and they were entitled to protection from those laws. If they become obnoxious to any set of men, it is insisted they must close their doors. If this precedent be followed, the day may come when fanaticism shall, with its thousands of followers, demand that places where liquors are sold shall be closed. The precedent of the theater, to-day, will be followed, to-morrow, by the closing of the place of business of an individual, or the church of some sect, obnoxious to any set of men. Born and reared in a government of laws, for one, I never will submit to the doctrine that the demands of lawless desperadoes shall dictate the terms on which men shall live in this community. Every idea of liberty, of personal independence and of order, rises up against such a despotism of the mob. But it is not on these questions you are to deliberate. You are sworn to try the simple issue between the people and these defendants—whether or not they were present at, and were in any manner connected with, the disturbance of the evening of the 10th of May. The grand jury of the county has sent to you that issue to determine, and to that alone shall I ask your attention. In the indictment against these parties, there are two counts: the first for a riot, the second for an assault and battery on Stuart J. Smith, the officer who testified that he was struck by a stone and staggered against the Opera House. The court will instruct you that under this indictment (which the court has decided to be good), you may convict or acquit any one or none of these defendants. Your duty is simply to say whether any one or none is guilty, or not.

The court will, on sentence, discriminate as to the degrees of guilt in apportioning the punishment, which, in its greatest extent, cannot exceed one year in the penitentiary and two hundred and fifty dollars fine, and may be reduced to the lowest term of imprisonment and the smallest fine.— Your attention must unquestionably be first given to the legal meaning of the term riot. I adopt the language of this court in their charge to the grand jury, as affording as good a rule as you can desire on the subject of riot. [*The District Attorney* then read from the charge of Judge DALY to the grand jury.] Blackstone, in his Commentaries, thus speaks of a riot and rioters, unlawful assemblages and affrays :—" An unlawful assemblage is when three or more persons assemble themselves together to do an unlawful act—as to pull down enclosures, to destroy a warren, or the game therein, and fail without doing it, or making any motion towards it. A riot is where three or more meet to do an unlawful act upon a common ground, as forcibly breaking down fences upon a right claimed of common or of way, and make some advances towards it. A riot is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel— as if they beat a man, a beast, and kill game in another's purchase, warren, or liberty, or to do any other unlawful act with force and violence, or even to do a lawful act, as removing a nuisance, in a violent and tumultuous manner. If a sudden disturbance arise amongst persons met together for an innocent purpose, they will be guilty of an affray; though if they form parties, and engage in any violent proceedings, with promises of mutual assistance, or if they are impelled with a sudden disposition to demolish a house or other building, there can be no doubt they are rioters, and will not be excused by the propriety of their original design. On this last doctrine, Hawkins is cited. From a work on criminal law, (Wharton's American Criminal Law,) *the District Attorney* read a few extracts, giving definitions of riots, and showing that even if there was proved no previous concert, if they acted as if with a common design

People v. Judson.

and common object, they were guilty.   *The District Attorney* here, having read the law on riots, unlawful assemblages, affrays, &c., proceeded:—

Having given you these enunciations of the law as to riots, and who are actors, and responsible, I call your attention to the testimony in the cause.   The character of the riot has been given to you by several witnesses, but particularly by Captain Carpenter, of the Fifth District Police, Captain Tilley, of the Thirteenth District, and Recorder Tallmadge.   You must be satisfied that in Astor Place and in Eighth Street, and in the streets leading to the Opera-House, thousands were collected together on the night of the 10th May.   In that crowd were found the rioters from the neighboring city of Philadelphia, which has been disgraced by scenes of turbulence and blood.   In the same crowd were discovered a notorious set of rowdies, known to themselves and the police as the "Short Boys."   It is stated in the evidence these rioters have their place of meeting.   Volleys of stones were thrown, and whilst they were being thrown the cry was heard, "stand by, Short Boys, don't let them arrest them."   This cry was heard whenever there was an attempt by the police to arrest any persons engaged in the riot.   You cannot but remember the statement of Recorder Tallmadge, that he left the Opera House, went into the street, and there found the mob assailing the Opera House with stones.   The police were stationed on the walk on the outside; attacks on attacks made on the police were repelled; arrests were made by the police, of the rioters, and attempts at rescue made; stones were thrown at the house, breaking the windows.   The missiles seriously injured also several policemen.   Many engaged in the suppression of the disturbance were struck with stones.   The stones came in repeatedly from Astor Place and Eighth Street into the theater, and endangered the lives of the persons within.   The panels of the door were forced in.   The police were unable to resist the force of the mob rushing on the Opera House.   Missiles were thrown in every direction.   The policemen and the Recorder himself were injured.   To such

an extent had violence proceeded, that in the language of this magistrate, "I told the Sheriff he must send for the military; that the civil force was not competent to suppress the disturbance. The military, which had been sent for by the Sheriff, arrived and halted, as I was informed, in Eighth Street; I desired they might be sent into Astor Place; they now passed by the main entrance in Astor Place, and as they passed, stones were thrown at them and the police." He desired General Hall to charge bayonet, so as to drive back the crowd. The military was either driven back, or forced back. Although the citizen soldiers were at this time severely injured by missiles of all kinds, yet they forbore to use their weapons. The Recorder advanced in front and desired the mob to disperse. His request was not complied with. The command for the first fire came from the Sheriff; the military fired in the air. "I saw," says the Recorder, "their pieces elevated." The fire was met by groans, hisses, threats, an abundant supply of stones and brickbats. The Recorder again ordered the mob to disperse. The military received a volley of stones, and several of them fell. Some policemen, near this magistrate, were also struck down with the missiles. General Hall then said, "You must give me the order to fire; my men will not remain here unless they can defend themselves." The magistrate said, "No, let me address the mob first." He then advanced, between the military and the crowd, and ordered them to disperse, or they would be fired upon. This admonition was repeated several times, and was received by a volley of stones against the policemen, the military and myself, says the Recorder, and with expressions of "d—n you, fire, if you dare." The magistrate saw several of the military fall from this shower of stones. General Hall reported eight as injured. One of the officers was shot in the leg with a pistol ball. The word "fire" was then given, and obeyed by the troops. The mob yielded, but formed again and commenced throwing stones; another order was given to fire. The mob then dispersed.

The testimony of Captain Carpenter shows that in the

early part of the evening he gave directions to keep the opening to the theater clear; to keep the crowd which was collecting back from the house; expressions were made use of in the crowd to the effect, "hit the stars," referring to the policemen, who are distinguished by that badge of office; he was compelled to bring up a reserve of policemen stationed in the vicinity, and they arrived just in time to prevent the mob forcing an entrance into the theater; they had already burst the panels out of the door; under his direction a body of policemen, after the arrival of the military, attempted to clear the street; it was a failure; the small body of cavalry and infantry were assailed with stones, groans and hisses; then the mob became more riotous; the glasses of the Opera House were broken; the lamps were broken, and the cry was heard, "put out the lights" from the mob. He sustains the statement of the Recorder in relation to the magistrate entreating the mob to retire—in relation to the shower of stones following his advice—as to the military and policemen being wounded before any order was given to fire—that the first fire appeared to have no effect on the mob. The mob filled up all the space from Broadway to Lafayette Place. It was excited; was noisy —tumultuous—shouting and hallooing; and, in reply to one of the jurors, the witness stated the mob could not have been quelled by any human force, without the aid of the military. The testimony of Captain Tilley, of the Thirteenth District, states that, after arresting a prisoner from Astor Place, he went into the theater, and there found the Sheriff, the Recorder, and the Chief of Police. Whilst standing speaking with them, the back door of the theater was smashed in on Eighth Street; a stone as large as his head came in through the panel, smashing, to use his expression, the door. An intense excitement was going on in Eighth Street—hallooing, shouting, cheering. The stones came in pretty thick. They were smashing in with stones and with their feet. Then it was that he appealed to the Chief of Police, "Are we going to stand here and let them come on to us?" He rushed out with a body of men. It was then

he cleared the street, with the exception of Judson's party, and the party with which he was communicating, and which was engaged in throwing stones at the theater, and when any arrest was made, cried out, "Rescue him! Rescue him!"

Can any one doubt that the scene which has been depicted comes within the definition of a riot? Has it not all the elements of a riot as given by the legal authorities? To the court you must refer for the law on this point, and according to your oaths, as you are bound to take the evidence of the facts from the witnesses on the stand, so you are bound to take the evidence of the law from the court. Assuming that the court will concur with the prosecution in their view of the law, that the evidence establishes a riot, then every person charged in this indictment who aided, encouraged or promoted it by words, gestures, or other acts, are principals. It is not necessary, as I have before stated, that a party should commit violence. Being armed with offensive weapons, or making use of threatening or turbulent gestures, or any act of assistance or encouragement, is sufficient to make him a principal.

Briefly, I will endeavor to call your recollection to the evidence in each case. I have condensed the testimony, and I hope to satisfy your minds, beyond a reasonable doubt, of the propriety of the conviction of every prisoner now on his trial. I want your patient attention in a matter of deep interest, as well to these prisoners as to this community. The evidence against Bennett is given by Captain Tilley, Policemen Davis, Smith, Hogan, Francis Bennett, and, I may add, Robbins and Jackson, witnesses introduced by the defendant himself. Tilley swears that, as he was going round to recognize the rioters, he saw Judson in communication with a crowd of young men and prisoner Bennett. The young men were standing in the street; Judson on the sidewalk, with his hands behind him. "I could see one of these young men," says Tilley, "go from the crowd and talk with Judson." Captain Tilley then pointed out Bennett, sitting on Judson's left, in this room, as the young man. He further stated that he covered his

People v. Judson.

star and placed himself near Judson, so that he might hear what Judson had to say. Judson entered into a conversation with a young man in front of him, and Bennett on his left. He heard Judson say distinctly, " that it was a shame Americans should be served so." He heard the young man who came from the party in the street, as he turned from Judson, say, "Now, boys, for a shower." This party numbered from twenty-five to thirty, who seemed to act together. A shower of stones came from them. After the stones were thrown, the young man with whom he had communication (unquestionably Bennett, as I will show you) came up to him, talked with him, put his hand on his shoulder, and they walked to the sidewalk together. Captain Tilley further adds that several persons had been arrested and rescued previous to the conversation with Judson and his adjutant, Bennett. Policeman Davis testifies he saw Bennett in the crowd, with a star uplifted above his head, crying, " Victory—three cheers for victory ! " Stones were thrown all the time. In Davis's language, he said he knew Bennett well; he arrested him. Policeman Smith arrested Bennett, with Davis ; Davis called his attention to Bennett's conduct; he was shouting; he saw Bennett shaking something over his head ; he was immediately heard by him to shout, " Victory, victory ! " He seized him, and took from him a policeman's star. When seen by Smith he was in the middle of the street, and not many persons between Smith and Bennett. In reply to a juror, he stated he was positive that Bennett was the man he took the star from; he had no doubt that he was the same man who was waving the star; he identified him the next morning. Policeman Hogan also identifies Bennett. After describing Judson as the master-spirit of the mob on Eighth Street—or, as he termed him, the focus around which the mob gathered—he stated that Bennett was on his left side ; he cannot be mistaken; he knows his scowl, and is sure he saw Judson and Bennett talking together. Mr. McChesney states he saw Judson whisper to one of the leading rioters, who would then go off. Who could that be but Bennett,

the prisoner, according to the testimony of Captain Tilley. But we have still, in addition, the testimony of Francis Bennett, whose name has produced more confusion here. He identifies Bennett as the man who was conversing with Judson, carrying messages to the rioters, and as the person who informed Judson that the captain of the 13th ward, Tilley, was watching Judson. This was undoubtedly the man whom Tilley referred to in his testimony, when he said, "After the man communicated with Judson he went back to the party in the street, and then a volley of stones went against the theatre, breaking the windows. Then some of the party were clinched by the officers, and that was succeeded by a cry of 'Let go of him; rescue him; rescue him.'" This was the struggle in which Bennett obtained the star and shouted victory. His own witnesses, Robbins and Jackson, both admit he had the star, and one of them admits he saw the star in his hand, with his arm raised about as high as his head. You may have observed how carefully he raised his hand, so as not to raise it above his head. What conclusion can you draw, but that Bennett was in the riot—active in support of its disorderly tendencies—the aid and supporter of Judson?

The apparent inconsistencies of the testimony are nothing in comparison with the positive assertions of witnesses as to his identification and conduct. The prisoner Matthews is charged on the testimony of Policeman Duryea, who states that he saw Matthews with a number of persons near him. The policeman's attention was first drawn to him as he was in the act of throwing something towards the building. He then stooped down for another stone, but before he stooped the policeman told him to go away or he would be arrested. He then moved a little away, but stooped to pick up another stone. He picked it up; he had the stone in his hand in the act of throwing when he was arrested by the witness. The stone was about the size of a goose egg. He held on the stone until he got inside of the house. What can be more distinct and unequivocal than this evidence? The prisoner Hosack is charged on the testi-

People *v.* Judson.

mony of Policeman Pitcher, who testifies that he saw him throw stones; that the prisoner stood on the sidewalk. Hosack appears to have been very violent.   He threw stones at the military.   After they fired the first time, he came across the street in Astor Place, about six feet ahead of the witness, who saw him pick up a stone.   He threw one stone; the witness made for him to catch him; five or six got between the witness and Hosack, and said he should not take him.   This gave the prisoner an opportunity to throw a second stone. . As soon as he threw the second stone the witness arrested him.   Both stones were thrown at the military.   At the time witness saw Hosack throw stones, citizens and military were knocked down by the missiles that were thrown.   The witness states he identified Hosack at the police office at Jefferson Market when he made his affidavit, and also identified him here in court at the opening of the trial.   When he was arrested the crowd cried out, "Don't let the d—d son of a b—h take him." This prisoner, certainly, has exhibited a determination to resort to the very last extremity, and you cannot but be satisfied that his guilt is proved beyond question.

The prisoner Adriance must be convicted on the evidence of policeman Birdsall, who has proved that he saw Adriance endeavor to rescue a prisoner who had been arrested by an officer in Astor Place, between the main door of the opera-house and Lafayette Place.   All cried out, "Don't let them take him."   Adriance said, "You sons of b——s," and raised his hand.   "I grabbed it," says the witness, "as a stone flew out of his hand, and struck the officer on the back of the neck.   I held on to Adriance, and did not let go of him until I took him in where the prisoners were.   I am positive that Adriance is the man; I saw him throw the stone; if I had the least shadow of doubt, I would not have made an affidavit against him."   What can be more explicit than this declaration?   The jury will remember the manner in which the question was put by me.   I confess, the assertion of his honorable counsel, and none more so at this bar, that Adriance was innocent, had deeply impressed me, and

I was anxious, if there should be a doubt, that he might have the benefit of it; but the evidence dissipated all doubt, and I was unwillingly compelled to believe him guilty. The offer to show the dress of Adriance different on that night, from that given by the policeman, has confirmed my impressions. The very shirt produced here, is of that description which might well be termed by the policeman a check shirt. But, as has been observed by my associate, this point of dress can have little weight with you, in comparison with the positive declaration of identity by policeman Birdsall. You may feel for his family all that the counsel has desired, but yet you must not forget, in sympathy for the innocent, the duty you owe your own oaths, to render a verdict according to the evidence.

Your attention will next be called to the conduct of Douglass on that night. Permit me to call your recollection to the fact admitted by the prisoner's counsel, that the prisoner was deaf, and to the fact proved by his witness McManus, of Douglass being there. The prosecution adds to that testimony the evidence of policeman Walsh that he saw Douglass in a crowd of riotous persons that were assailing the opera-house with stones. He was in a mob, engaged in throwing missiles of different kinds. He saw Douglass throw a stone, or attempt to throw it; and he seized him immediately. He was taken into the opera-house. He was in a mob of persons yelling and shouting, and throwing missiles. The rallying cry was "Fight! fight!" Douglass then threw a stone at the opera-house. It seemed to slip or drop from his hand; he stooped and picked it up. As to identity, he swears to the best of his judgment he is the man. He appeared to be deaf; he was very cool after he was brought in. The witness said to him, he was very foolish for being there; the prisoner remarked he only threw one stone. Remember this important fact was elicited on cross-examination by the skillful and modest counsel of Douglass. The witness, on cross-examination, stated he saw the stone in Douglass's hand. He made the motion as if throwing it; and when the witness arrested him, simul-

taneous with this motion, the stone was not in his hand. The witness stood within two feet of the prisoner; Douglass was on the edge of the mob. Whenever an arrest was made, there was a rush on the part of the mob to rescue him. The mob was wavering to and fro. The witness concealed his star, and in that way managed to mingle in the crowd, and to arrest the rioters. An attempt has been made to show inconsistency in the statement of Walsh now and at the time of his making an affidavit last May against Douglass. That affidavit is the same story as given here, and I will read it to you. [The affidavit was read.]

One of the most striking facts against Douglass is, that it appears from this affidavit that he declined to ask Walsh at that time any questions. Why did he not, on the 11th of May last, endeavor to show, from a cross-examination of Walsh, that there was some mistake? Not an effort was made then, because it would have been utterly unsuccessful. The unparalleled effrontery of such an attempt was left for those who imagined they could brow-beat a witness or mislead a jury. It is for you to determine how far this attempt shall now be successful. It is for you to determine whether or not the prisoner's own admission, that he threw a stone, is to be credited. The court and jury will remember that in reply to a question from the court, the witness stated there was light from the Opera House, by which he distinguished Douglass. It was sufficiently light to distinguish persons in the crowd where Douglass was. The windows along the amphitheatre were lighted. The lights over the door were all boarded up. Douglass was not out of witness's possession from the time of his arrest until placed in the Opera House. The prisoner Green is implicated by the testimony of policeman McManus, who testifies he arrested him between the entrance of the Opera House on Astor Place and the east end of the building. He was standing ten or fifteen feet from the curb stone, on the street, among a number of persons. When first seen by the witness, he had thrown a stone. The witness then concealed his star, went within two feet of him, and saw both his

hands by his side.   He went close to him, felt his hand, and there was sand in it.   He then grabbed Green's other hand and a stone fell from it.   He then grabbed Green by the neck; the stone which fell from his hand was about the size of witness's fist; the hand which had the sand in it was the right hand, and the same from which he threw the stone towards the Opera House.   Green said he had been inside of the theatre and could not get in again, and he would be d——d if he would not have satisfaction.

The effort made to shake Mr. McManus' testimony is not successful.   Dr. Ogden confirms all that McManus has stated here.   McManus told Dr. Ogden, as the doctor states, that Green had sand in his hand, and he saw Green throw the stone.   Peaceable as Green may have been heretofore, this testimony shows a determination on his part to rush into the thickest of the melee in the inside of the house, and an active participation in the riotous scenes without.

The next prisoner is O'Neill, against whom policeman Savage appears.   He testifies he saw O'Neill in Astor Place in front of the mob, with others.   He saw him pick up a stone and throw it up to them, and as he drew back his hand the witness grabbed him and held on to him until he got him into the theater; he dropped the stone after he was in the theater; there was a crowd all round O'Neill.   After his arrest, witness spoke to him.   He then said he "did not intend to get into a muss,"—he threw stones only because he saw others do so.   He picked up the stones very coolly.

With O'Neill closes the list of prisoners in this indictment, and now on trial, with the exception of Judson.   Before leaving them, permit me to say that, to my mind, the evidence against all is conclusive.   I will not deny that many of them are young—some of them with families; but I cannot but also remember that their misdeeds on that awful night brought agony and death to many, and sent many of their fellow beings unprepared before their God,—that the blood of the sacrificed rises in judgment against them.; and however we may pity those with whom they are

connected, we cannot close our eyes to the evidence, which brands guilt upon the brows of the accused.

Last and mightiest, and, might I not add, the meanest of the band, stands Edward Z. C. Judson, *alias* Ned Buntline. The other defendants have proved character by witnesses— Judson has had his character stamped by the testimony. He stands admitted " the chief architect of ruin." On that picture Judson stands pre-eminently forth as the great figure on that night of horror. His counsel says he is a gentleman by birth, a scholar by education, and a man of genius. I know not where the counsel obtains his gauge of a gentleman's character when Judson is his great exemplar. A gentleman is not found armed with sword and pistols in the midst of unarmed men—a gentleman is not found associated with Philadelphia Killers, and co-operating with riotous bands of " Short Boys."

The education which I had supposed useful was that which taught men to respect themselves—to respect their fellow men, and to respect the laws of their country. The education of Judson, as developed on this trial, shows him an adept in the school of violence and bloodshed. The counsel states he has served his country in the army and navy. Either service would satisfy the ambition of most men, but both seemed to have been unsatisfactory to Judson. The counsel for the defense states he has fought the battles of his country. The history of his country, as I read it, contains no statement of the battles he has fought ; no medal has been voted to him by the assembled representatives of a grateful people ; but, perhaps, in reviewing his life, art might find a subject for a proper medallion. Perhaps it might present the scene of Venus conquering Mars, and on the reverse this motto : " At Hastings I have ruined my king." Whatever he has been, to-day we find him not in the army or navy, but the co-proprietor of a vile newspaper—a beast of prey hanging on the great camp of humanity, and living on the carrion of bloated character and vice. Why has he left the service? Why has he abandoned both the camp and the desk? There must have

been some cause; and I leave it to you, gentlemen, to sur-
mise whether or not his virtues compelled him to separate
himself from his country's service.    I know not of his pro-
motion in the latter branch of the public service; but prob-
ably, and when his life shall be written, it will be seen he
had chances of elevation in a civil capacity not usually
accorded to most men.

Fortunate for the military and naval service—which
embraces in its list names distinguished for private virtue,
for valor, for submission to law,—that it is not disgraced
by a name which hereafter will be synonymous with deep
hypocrisy and cowardly ruffianism.    Fortunate that it is
forever separated from the name of a man who has been
the leader of a riot which has disgraced the great metropo-
lis of the western world.    But why refer to his past career?
Why was not the evidence produced of good character?
The answer is obvious.    The counsel for the defense well
knew that until evidence of good character was offered,
none proving Judson infamous could be offered by the
prosecution.    This is the rule of law.    Had such evidence
been at hand, would it not have been produced?    Most
assuredly.    But I ask for no proof of bad character, except
such as is here in evidence.    I ask for no better evidence of
his degraded position, his deep malignity of heart, his utter
want of feeling, his reckless, remorseless, and blackened
heart, than his conduct on the night of the riot.    The tes-
timony against Judson is two-fold.    It may be divided into
preparation for the riot, and his participation in its awful
results.    He cannot plead in extenuation that he was act-
ing under sudden promptings of the excited scene of the
evening of the 10th May.    He had deliberated — he had
planned—he had armed himself for the affray, and went to
the opera-house resolved on turbulence and riot.    Mr.
Corbyn testifies that on the 8th or 9th of May last Judson
turned into Barclay Street with a wagon, and addressing
the witness said: "Corbyn, you are the very man I wanted
to see; where does Ned Forrest live?"    The witness an-
swered, it was somewhere in Chelsea.    Judson then said,

" You know there's going to be a muss, and I want to see Forrest, to ascertain whether he is right or wrong in the cause. I consider myself the leader of the Native American party in this matter. If Forrest is right, I mean to see him through." The witness then said, "' I should think you had rows enough without interfering in this. I expect there will be some hard fighting, and I advise you to keep out of it." Judson said, " That may be, but I mean to see it out."

We will now follow him in his course of seeing this matter out. We come next to the testimony of Francis Bennett. Judson is fixed with guilt, by his exclamation that " he would see the muss out," as supported by the statement of Corbyn. Omitting for the present Bennett's testimony, Captain Tilley is introduced by the prosecution. You may remember, in the description of the riot, Captain Tilley stated he was in the Opera House, and the riot and tumult in Eighth street induced him to ask for a force to clear the street. Whilst going around to recognize those who were in the riot, Captain Tilley says, I saw a communication between Mr. Judson and a crowd of young men, and the defendant Bennett, as I believe; Judson was on the sidewalk, and then I could see one of these young men go from the crowd and talk to Judson, who had his hands behind him ; I got my star inside, and went up behind Judson to hear what he had to say; he leaned over and entered into a conversation in a low tone with the young man in front, and Bennett on his left. Captain Tilley heard but part of the conversation—" It was a shame Americans should be used so "—that was in connection with other language. The man who came from the party in the street, as he turned from Judson, said, " Now, boys, for a shower." Prior to that I heard Judson say, " Boys, whatever is to be done, must be done quickly, because the military are coming." When the man said, " Now for a shower," Judson said, " Hold on, boys, till you are all ready." With that, a volley of stones went against the Opera House. Captain Tilley states he went into the Opera House, to get suf-

ficient men to surround Judson's party, as I may call it,
and arrest them. There were from twenty to twenty-five or
thirty, who seemed to act together; the shower of stones
came from them. Tilley states also, he saw Judson just
before the military arrived; I had seen him on the sidewalk
from twenty to twenty-five minutes before I saw him in
the Opera House. Before he saw Judson, stones had been
thrown. After the stones were thrown, the man with
whom Judson had communication came up to him, talked
to him, put his hand on his shoulder, and both went on the
sidewalk together. It was so light, I could see as plainly
the parties there, as I could see the counsel in this court.
The boards inside of the windows were so slightly put up,
that they were thrown down by the stones. The party with
which Judson was communicating was throwing stones, and
when arrests were made the cry was raised, "Rescue him!
rescue them!" The testimony of Gulick is to the effect that
he was at the Opera House on the night in question; he saw
Judson in Eighth street in a great crowd. The witness heard
some one cry out, "The ground is your own, you have a right
to it, and I will defend you in your rights;" is not this resist-
ance to the authorities? The witness turned round in the
direction from which the voice came, and saw Judson
throwing up his arms, as if in the act of exhorting the
mob. He said they need not be alarmed; the military had
nothing but blank cartridges, and nobody would be hurt.
The evidence of Hogan shows he saw Judson and Ben-
nett and another prisoner, at the Opera House in Eighth
street. He saw Buntline, as he calls him, in Eighth street,
nearly opposite the door where the actors go in, and after-
wards in the street, where there was a crowd; he appeared
to be the master spirit; the focus around which the mob
gathered; the mob acted as if they intended to attack and
stone the building. The witness took Buntline, by his con-
duct, to be exciting the people to violence; Buntline gestic-
ulated; Buntline was talking low to Bennett; neither
Buntline nor Bennett were dressed now as they were then;
he had known Buntline for some time by sight. *The District*

*Attorney* then referred to the fact that Judson invited Frank Bennett, his brother-in-law, on the night of the riot, to go out with him; that, before leaving the house, he disguised himself in an overcoat belonging to Bennett, and a Tom Hyer cap; that, before leaving the house, he went up stairs; that this was probably to get from his armory his sword and pistols, which it appeared he had; that they went to the Opera House; Judson was in communication with a party engaged in rioting; that he said, "Are there any Americans here?" and one person answered, "I am a Northern Liberty boy." Judson answered that he was Ned Buntline, and remarked that they wanted a nucleus; that Judson became, as it were, the field marshal, and had direction of the operations; that one of the party said, "Now, boys, for a shower." Previous to this, Judson said, "Boys, whatever is to be done, must be done quickly, as the military are coming;" and also said, as the stones were being thrown, "Hold on, boys, until you are all ready;" that this was followed by a volley of stones at the house; that Judson proposed to get shavings and raise the cry of fire, to enter the theater and drive them all out. None but a fiend could have suggested such a proposition.

Little did Judson reck the consequences of such a cry, or such a movement. Little did he care for the consequences of an inroad into that building, crowded to excess; little did he care what mangling of limbs or destruction of human life might follow on such an act. Does not the proposition fully justify the character I gave him of a reckless and remorseless heart? Nay, more, when the authorities were deeply engaged in the suppression of the mob and driving back the rioters, Judson cried out, "Don't back down," and said the ordering of the military was an insult to the people, that they must not be alarmed, the military had nothing but blank cartridges.

*The District Attorney* then referred to the testimony of the witnesses as to Judson's conduct in exciting the mob and directing their movements, and to the testimony of Mrs. Bennett, that Judson's pistols were brought back to

the house by Stanley, Judson's partner. He referred to the cunning of Judson, after his arrest, in having Stanley take the pistols from his pockets, and then Judson insisting on being searched, when he knew nothing could be found on him. *The District Attorney* insisted that, not on the testimony of one witness, but all combined, a case of inevitable conviction was placed before the jury, and that it was their duty to render a verdict of guilty against him, as the most active in originating and directing and resisting the authorities in the preservation of the peace. I have thus far endeavored to present to you the evidence on which should rest your verdict of conviction against Judson and his associates in this indictment. Let it not be supposed that their conviction is sought for by those intrusted with the execution of the laws, to sacrifice any of the persons charged. The verdict required at your hands is demanded in the name of the personal security and peace of your fellow citizens. This trial places in your hands the lives, the property, and quiet of this vast metropolis. It is a question whether the law shall be obeyed and order reign, or lawless bands hold the destinies of us all in their grasp. It rises far above the ordinary trial of a common disturbance of the public peace. The occurrences of the 10th of May— of that night of horror—have presented this subject as a great public question, involving the character of our institutions. The men whose acts disturbed the peace of the city, and brought blood on our city, struck a blow at the American character. The "deep incarnadine of that guilt" is upon them, and it is for you to declare it by your verdict.

If there be, gentlemen, one striking element in the American character, it is a love of order. Each man feels that this is a firm foundation on which rises the superstructure of our liberties. Each man feels that amidst disorder and chaos there can be no security for life or property, and, under the influence of that feeling, submission to law predominates throughout the community. This love of order is strikingly developed in every period of our history, and in every action of this confederacy. The same spirit which

ere since landed at Plymouth, on the Atlantic, to-day is manifest on the shores of the Pacific.   That spirit has gone with our people from their homes; it has crossed the Isthmus; has gone hand in hand with them up the Pacific, and governs at this moment amidst a people thrown together without law and without a judiciary.   You have seen that feeling of order sufficiently powerful to punish those "hounds" who had disturbed the public peace; and shall it be said that you will pass unnoticed such acts as men amidst the sands of California would be punished for? And will you, defended by all the arrayments of an enlightened judiciary, with the advantages of high civilization, surrounded with everything which should prompt you to the maintenance of order—will you refuse to accord to your fellow citizens that protection which, without law, is afforded in the very midst of men without law and without the organization of government?   I am satisfied that you will not.   The duty which you owe to the laws of your country will be performed.   The verdict you will render, stamping guilt on these prisoners, will be but the inevitable consequence of the evidence which has been submitted.

That verdict will remain

"A great sea mart for all time,"

a monument of the intelligence and integrity of jurors—of their devotion to the laws, and, above all, their determination to uphold and sustain good order and peace in this metropolis.

### JUDGE DALY'S CHARGE.

Judge DALY charged the jury as follows:

Gentlemen of the Jury:  If this was an ordinary case, I would consider my duty sufficiently discharged by stating the law pertaining to it, and giving you such an analysis of the evidence as would assist you in ascertaining the guilt or innocence of the prisoners.   But it is no ordinary case. There are principles involved in it of the deepest moment— considerations growing out of it which affect the whole frame-work of society.   It is true, that it is not the first

case in which circumstances similar to those we are here investigating have been brought up for the consideration of a court and jury. Indeed, it is a matter of painful knowledge, that of late they have been but too lamentably frequent. But the gloomy close of the catastrophe out of which this prosecution has arisen—the great destruction of human life that attended the restoration of peace and order, have invested this case with a solemn earnestness that distinguishes it from all that have preceded it. It is a case but too fruitfully suggestive—a most fearful and bloody commentary upon the consequences that follow when individuals substitute their own impetuous will and ungovernable impulses for the peaceful regulations of society. It is one of those cases that teach us the value of law and the necessity of rigidly maintaining the distinctions which exist in the acts of individuals between the rational enjoyment of freedom and the unrestrained exercise of lawless license. The law is nothing else, gentlemen, but the will of society, resolved upon in moments of calm deliberation, enacted by all for the benefit of each. It is the representative of man's aggregate power in the social state, and derives its authority from the binding obligation of imperative necessity.

As a nation becomes more free, the authority of the law must advance—the rights of individuals are more closely discriminated and subjected to more exact definition. To preserve the just equipoise of society, therefore—to keep the complicated relations of an advancing civilization in harmonious action, the supreme authority of the law, and the obedience of the people to it, become the first of national necessities. When instituted under a free government, by the popular will, and liable to be changed whenever the people decree it, the obligation to obey it, while in force, is one of those fundamental truths which, in a free government, needs but to be stated. In other lands the law is regarded as something antagonistic to the people. It is clothed in the trappings of power and decked in the pomp of authority—the mandate of the few for the government

*People v. Judson.*

of the many, and felt too frequently but in the oppression it produces. But with us it is the work of our own hands, and subject to any modification to which we may subject it. It is the means by which our liberty is defined, and the source through which it is enjoyed. It is framed for no favored class; designed for no privileged order. Like the sun in heaven, it sheds its influence equally upon all; for there is no citizen so humble, and no being so degraded, to whom it extends not its protection—to whom, in the hour of suffering and wrong, it may not serve as a safeguard and a shield.

All have, therefore, a personal interest in increasing the authority of the law; and when we do aught to impair its force, or weaken its influence, we but turn the sword against our own household, and pull down the pillars of the temple that shelters us. A great work was accomplished for man, and man's development, in the formation of the government under which we live. The framers of that government have left us institutions in which the rights of the individual are more distinctly recognized and secured by higher guaranties than they had ever been before. A great political structure has been reared for us, and to us is committed the comparatively trifling duty of preserving it. Whatever, therefore, may impair its stability, it is the duty of all to unite in preventing. If inroads are made upon the rights it guarantees, they are to be resisted, come from what source they will—from a ruler or a common man. We too frequently lose sight of the tyranny of the man, from the position he occupies in society; forgetful that the aristocrat by nature may be detected in rags, as well as found clothed in purple.

A man conforms to the Christian precept and the republican standard, in proportion as he respects the rights of his fellow-man; and if he manifests the disposition to infringe them, he is a tyrant by nature, and is to be resisted as such. The act of the rioter of our day, invading the sanctuary of a private dwelling, and trampling upon the rights of his fellow-men, brings us back to the barbarism of the middle

ages—to the days of the military marauder and the feudal despot. For though centuries have intervened, the nature of the men is the same ; or they differ, if they differ at all, but in the circumstance, that one claimed the privilege to oppress as a divine and hereditary right, and the other claims to exercise it as the prerogative of liberty.

Come, therefore, from what source it will, the attempt to overthrow the supremacy of the law by force and violence is to be resisted, and that promptly, at the outset. As it is impossible to tell, from the spark of ignition, how far the conflagration may extend, so is it impossible to discern, in the first gathering of a popular tumult, what consequences may follow it—whether it will be but the affair of a day, or grow big with the destiny of a nation. The records of the past are studded with too many instances of society given up to the sanguinary dominion of mobs not to know their nature and feel alive to their danger. Such scenes are the elements that bring to fearful development the latent ferocity of man's nature ; in which the worst men come up to the surface and exercise control and dominion. If they are permitted to go on unchecked, disorder creeps into the State—disorder, the parent of that worst of oppressions which is born of anarchy, and subject to the uncertain chances of which the victor of to-day becomes the victim to-morrow. No, gentlemen, the blessings of liberty are the blessings of law ; the security of both, the preservation of order ; and he who, wantonly and wilfully, disturbs it, is to be treated as the enemy of his race, and the foe of society.

These considerations, gentlemen, meet us at the threshold of the case. I advert to them, because the frequent recurrence of these scenes of violence and disorder has given countenance to the unfounded opinion, that they are to be regarded as the natural effect of the working of our free institutions. The inefficiency of courts, or the unwillingness of juries to convict in such cases, have led many to think that the laws are powerless to repress them. So far have things gone in the lax administration of justice, that

these outbreaks are not without their eulogists; nay, those who argue their necessity.

Within a comparatively recent period, the municipal council of a neighboring city deliberately passed a resolution to the effect that such occasional outbreaks were necessary to the cultivation of brave and courageous habits in our youth, as if the noble quality of courage was attested by burning the dwellings of defenseless women, and defacing temples erected to the worship of a common God; propounding the monstrous doctrine, that it is essential that the youth of this country should pass through a pupilage of bloodshed; that to fit him for the rational duties of the citizen, he should be encouraged to the development of propensities in which the savage is his equal. I address these considerations strongly to you, gentlemen, because if the law has been violated it rests with you whether the laws shall be vindicated or not; for, in criminal cases, however much we may dwell upon laws and constitutions, to the practical power wielded in the jury box must we come at last. It depends upon the conscientiousness with which that power is exercised, whether justice can be administered or not.

To the jury must the citizen turn, with high hope, or with anxious fear, for everything depends upon the integrity and firmness of jurors, as every thing is to be feared from their corruption or servility. A man may do, as respects himself, or in his personal matters, what he may not do as a public man. He alone is affected. In the one case an act may be forgiven as a weakness, which approximates in the other to the nature of a crime. This is a consideration that a juror is never to lose sight of when he enters upon the discharge of public duties; his individual will or wishes are to be merged in the great duty that he owes to society. This will apply to every case in which a juror is called to act; but there are certain cases, which, from the consequences that follow a dereliction from duty, increase the responsibility of the juror in proportion to the results which that dereliction produces. This is one of those cases. That

the law should be sustained in such a case, concerns most deeply the peace and welfare of society. That it should be maintained in this city, the chief city of the Union, is a more important consideration than it would be elsewhere. This great metropolis is the national heart, and sends out pulsations that reach to the remotest arteries of our wide-spread confederacy. Here, then, at this central point of attraction, towards which everything concentrates, and from which everything radiates, it is befitting that an example should be set, which shall be a precedent to the country at large—an example of the faithful and firm administration of justice, which shall serve hereafter as a steady light to steer by, when darkness and tempest gather around the State.

In connection with what I have already said, there are other considerations to which your attention should be drawn. A great portion of this trial, both in the introduction of the testimony, and in the comments of counsel, has been devoted to the consideration of matters which have nothing to do with the question of the guilt or the innocence of the prisoners. We can have nothing to do with the question whether the conduct of the authorities was censurable or otherwise—whether a more judicious course might have been pursued than the one adopted. The authorities must answer to the law if they have violated it in any particular; or if they are not within the pale of legal responsibility, they must answer at the great bar of public opinion. Neither is it any part of our inquiry to determine whether the inter-position of the military was necessary—whether the distur-bance could have been quelled by the police force without their aid. This forms no part of the question respecting the guilt or innocence of the prisoners. They all, with one exception, stand indicted for acts alleged to have been done before the military fired, and they were arrested; in fact, before the military came upon the ground. Their acts were not provoked by the firing, or the appearance of the mili-tary. And if they were, it would not excuse such acts. The military were there by the order of the city authorities,

People v. Judson.

and it was the duty of all citizens to retire before them. Neither are you to be influenced by what has been addressed to you in respect to the condition in life of the defendants —that they have families dependent upon them for support. This might be urged to a jury in the case of every prisoner, for there are few who are without close if not dependent domestic ties. So with respect to the youth of some of the defendants. This is a matter addressed solely to the discrimination of the court; and the court is gifted with a large discretion in such matters. Should any or all of these defendants be convicted, the court, when called upon to perform the last act of the law, will not be unmindful of the tender youth of some of them, but will distinguish between acts which spring from the unreflecting nature of youth, and acts which are the deliberate deeds of perverted manhood. And in passing upon the issue, and the only issue here, you are not to be drawn off from the plain import of testimony by wire-drawn distinctions, or conceivable possibilities. There is no subject of human inquiry which may not be involved in inextricable confusion by admitting such disturbing influences. If you do not keep steadily before you the real object of your inquiry, especially in a case like this, you will be lost in a sea of uncertainty. Everything, therefore, addressed to your prejudices—to your sympathies—which may be designed to confuse your understanding, or perplex your judgment, is to be carefully watched and rejected. When such considerations are addressed to you by advocates, you are always to bear in mind the position of the advocate, and to attach value to what he says in proportion to the sincerity with which he utters it. When an advocate appears as the advocate of accused innocence, no position a human being can occupy is, perhaps, more exalted; but we cannot shut our eyes to the fact that an advocate, in many cases, strives merely to get off his client. With him it is a trial of professional skill — the making of a professional reputation. For this purpose the means by which a juror may be influenced becomes not unfrequently a matter of professional calcula-

tion, and is sometimes reduced to the certainty of an act; and where such means secure the acquittal of the guilty, however much we may admire the display of professional skill, we cannot forget that it is a triumph over justice. Far different is the position of the jury, the court and the prosecuting officers; with them the only motive can be to ascertain if parties be guilty or innocent. The course of their duty is plain, and they have no election but to pursue it. Neither are you to be influenced in this case by what you may have read, or what may have been directed to you through the public press. The press is, perhaps, the greatest engine of modern civilization. It is impossible not to feel the reality of its power, and to appreciate the extent of its influence; and that influence is no inconsiderable matter, when used to influence the determination of a criminal trial. It is not unusual for the judiciary to deprecate the publication of trials during their progress. I feel, however, no occasion to do so. I am strongly disposed to think that such publications do much to familiarize the public with the practical working of the laws; to beget in the mass of citizens habits of discrimination and reflection; to create habits of mental discipline in respect to legal subjects, that go far to qualify them for the duty of jurors —a duty that must be discharged by all classes of community. But the publication of trials while in progress, subjects courts and jurors to a higher accountability. In opposition to the less liberal countries of Europe, our trials are required to be held in public; and their wider publicity, through the instrumentality of the press, is but the extension of a great and politic principle. The regret is that they are not more fully and accurately reported. The defect lies in the manner in which the thing is done—not in the thing itself. But it is carrying the prerogative entirely too far for public journalists to anticipate the course of trials, and upon the report of testimony published in their columns, to dictate to jurors what verdicts they should render. Conductors of journals, who merely read the testimony, even if accurately and faithfully reported, are not in a position to say to a jury who

People *v.* Judson.

have heard all the testimony, and noted the manner of the witnesses, what course should be pursued. It not unfrequently happens in the course of the administration of justice, that the manner of a witness may induce a jury to discredit every word he utters. General considerations come appropriately from the press; but when they undertake to direct what disposition should be made by a jury in particular instances, they set a precedent which the strongest case will not justify, and which, as a matter of general adoption and common custom, would be disastrous to the rights of accused persons.

Before proceeding to the particular examination of the evidence for and against the prisoners, it is proper that your attention should be called to some general matters arising out of the nature of that evidence. As respects the prisoners here, the main question is one of their identity with the persons who did the acts described by the witnesses, as it is possible that in such a tumultuous assemblage, mistakes may have occurred in making arrests. It is due to these persons that you should discriminate most closely in this respect, and be well satisfied that they are the persons who did the acts with which they are charged. It would be lamentable, indeed, if any of them should be convicted for the acts of others. You will therefore take into consideration the darkness of the night, the extinguishment of the lamps, and generally the excited nature of the scene. You must discriminate, also, between testimony which is positive and that which is purely negative. A witness who swears that he saw an act done is not to be disbelieved, though many who were present declare that they did not see it, unless their proximity, their number and their opportunity for observation are such as to render it impossible that it could have transpired without their observing it.

A great portion of this case has been occupied in testimony as to the exact period of time at which particular events occurred, and much comment has been made by counsel upon the inconsistency of witnesses with each other in this respect. This is a matter which is entitled to but little

consideration; for nothing is generally so unsatisfactory in the course of judicial investigation as the attempt to fix so fleeting a thing as time. Unless the attention of a witness is called to the exact period of time when the event occurs, or unless he is enabled to estimate from a given point the period at which a subsequent event occurred, very little value is to be attached to the effort of his memory. We take cognizance of the great divisions of the day, and may say whether an event occurred in the morning, at noon, or in the evening; but when a witness undertakes to swear positively, from mere memory, to the fractions of hours or to minutes, we may well distrust his testimony and doubt his sincerity. If any gentleman of the jury were called upon at this moment to say at what time of the day the examination of any particular witness was begun during the trial of this cause, he would find it impossible perhaps to answer; and were the twelve jurors to exchange their views respecting it, a very great diversity of opinion would be discovered. This difficulty is, of course, increased where parties are present at a scene of great public excitement, where events are rapidly transpiring, and where confusion prevails.

We now approach, gentlemen, the true subject of your inquiry, and the questions it presents are few, plain, and fraught with no intrinsic difficulty. You are simply to say, when advised by the court as to the law, whether a riot occurred on the night of the 10th of May, and whether the defendants participated in it. The right of the people peacefully to assemble to discuss or deliberate upon matters of a public or private nature, is one of those fundamental rights secured by the constitution itself, and the privilege of animadverting freely upon public men and public measures is an incident growing out of that right. This is plainly distinguishable, however, from assembling with an intent to commit violence upon persons or property, to resist the execution of the laws, to disturb public order, or for the perpetration of acts inspiring public terror or alarm. Any disturbance of public order by force is a breach of the

People v. Judson.

peace.   Any tumultuous assemblage of three or more persons brought together for no legal or constitutional object, deporting themselves in such manner as to endanger the public peace and excite terror and alarm in rational and firm-minded persons, is unlawful; and whenever three or more persons, in a tumultuous manner, use force or violence in the execution of any design wherein the law does not allow the use of force, they are guilty of a riot.   A riot may be defined to be a tumultuous disturbance of the public peace by three or more persons assembled together of their own authority, mutually assisting each other against all who oppose them, and engaged in executing some design in a violent and turbulent manner, to the terror and alarm of bystanders or the neighborhood.   The offenses comprehended within this general definition constitute three kinds of offenses—an unlawful assembly, a rout, and a riot.   The unlawful assembly is where the parties come together with the intent before stated; rout is where they move forward to the execution of their design, and the riot takes place when they begin with force and violence to execute their design. Distinguishable from either of these offenses, is the offense which is denominated an affray.   An affray is when persons come together without a premeditated design to disturb the peace, and suddenly break out into a quarrel among themselves; and it is contradistinguished from a riot, by being more of a private nature.   Certain ingredients are insisted upon by the counsel for the accused, as entering into the composition of the offense of a riot.   It is difficult to distinguish and fix with the accurateness of a definition, the precise boundaries which separate the particular offenses that grow out of the attempt to disturb or subvert public order.   It is insisted upon by the counsel, that to constitute the offense of a riot, the parties must be engaged in the prosecution of a private purpose.   In one sense this is true. The purpose is private, when it is to be distinguished from an armed attempt to overthrow and subvert the government by force and violence; as if, when the majority of the people have decreed a certain form of government, a portion

of them, a minority, attempt to overthrow it by force. It is, moreover, insisted that there must be a concert of action. This is also true; but the concert of action may exist in the execution of the act. It is not necessary that the parties should deliberate before hand, that they should interchange views with each other before commencing the execution of the design. In this case there is abundant evidence from which we may infer such a concert of action, in the attempt of the persons present to force their way into the theater, in the combined action of those on the east end of the building, who were engaged in rescuing the offenders from the officers, and preventing their making arrests—who rallied to the resistance of the police, under the cognomen of "Short Boys." There was concert of action among the crowd of persons who were engaged in assailing the building on the Eighth Street side, under guidance and direction of the defendant Judson.

It is insisted by the counsel that there is no evidence in the case of a common design, to constitute the offense of a riot. It is declared by Sir Wm. Blackstone, that a riot may exist with or without a common design. I have embraced a common design, however, in the definition I have given you, although I might with safety have rested upon the definition of Blackstone, whose luminous mind, quick perception, and ready power of analysis, enabled him, in almost every instance, to subject the matter upon which he treated, to definitions so exact and perfect as to serve the purpose of all future time. But there is abundant evidence of a common design which was unlawful: the attempt to rush into the theater; a combination of a large number of individuals to injure the building, who were engaged in assailing it with stones, breaking the windows and forcing in the doors; the proposition to enter the building with ladders from the rear—the ladders being ready and prepared for that purpose—and drive out those who were inside, and who had a lawful right to remain there; the proposition to create confusion and tumult inside, by raising the cry of fire; the proposition of the defendant, Judson, to get to-

gether a lot of shavings and fire them, either with the view of destroying the building, or of giving color to the cry of fire. It would, perhaps, scarcely be safe to infer from this branch of the evidence, that the diabolical intention existed on the part of that defendant, or those acting with him, to fire the building, crowded with human beings. Such an intention would manifest a degree of depravity approximating rather to the nature of a fiend than to anything human. It is better, therefore, to put the more charitable construction upon it, and to suppose that he simply intended to give color to the alarm of fire. A common design was manifested, moreover, in the many combined attempts to resist the authority of the police. In fact, the whole scene, as described by the witnesses, leaves but little doubt as to the intent of the guilty actors in it. Those engaged in Eighth Street are described by the witnesses as wild with excitement; and the mass congregated in Astor Place are pictured, by some of the witnesses, as inflamed to the highest pitch of excitement, and as heaving to and fro like the tumultuous waves of the ocean. The whole scene in Astor Place is most graphically described, and with great circumstantiality of detail, by his Honor, the Recorder. The judge then read to the jury the testimony of Recorder Tallmadge, and said, that from this, and all the testimony in the case, there could be little doubt that a riot existed within the definition he had given. He then defined what was necessary to constitute a party, or participator. Any act, furthering and in aid of the common design, is sufficient. In a riot, all who participate are principals. It is an offense in which there must be three or may be many actors. The law does not distinguish between the relative degrees of violence used by individuals, but every one who participates is responsible for all that has taken place. The only discrimination which the law makes, is the discretion given to the court in apportioning the degree of punishment. It is not necessary that a party should do some physical act, such as throwing a stone. If a riot take place, all who aid, encourage or promote it, by words, signs,

gestures or other acts, are principals. It is not necessary that a party should commit personal violence, being armed with offensive weapons, or making use of threatening speeches or turbulent gestures; any act of assistance or encouragement is sufficient to make him a principal.

Judge DALY here entered into an elaborate review of the testimony elicited from the various witnesses and placed before the jury, in a concise and lucid manner, the whole chain of evidence. He commented strongly in favor of the accused upon the evidence they had furnished of previous good character. This was, he said, a matter entitled to very great consideration. He was well panoplied, who, when brought into a court of justice to answer an accusation, could throw himself back upon a life well spent. All the accused, with the exception of the defendant Judson, had furnished testimony upon this point most clear and satisfactory. If the evidence of their participation, therefore, was not direct, positive and conclusive, their previous good character should outweigh in the balance, and as respects the defendant Judson, who had not put his character in issue, he was entitled to be regarded here as of good character, for the law draws that presumption in favor of every accused person, until the contrary appears. Much had been said by his counsel in vindication of his character, and much by the prosecuting officer in reply. This was to be treated as out of the case. He stood here upon the evidence; he was to be judged by that, and that alone. If he were the vilest creature that ever lived he had rights here that were not to be taken from him, and unless his guilty participation could be distinctly and clearly made out from the evidence, he should be acquitted.

The judge, after some further comments upon the testimony, concluded as follows:—" I commit this case, gentlemen, into your hands. If you have any doubt as to the guilt of any or all of these prisoners, then, in the benevolent charity of the law, give them the benefit of that doubt and acquit them; but if their participation be palpably proved by the testimony, and you fail to find according to the fact,

you would thereby violate your duty as jurors. I surrender it to you with the conviction that it is in the hands of enlightened and impartial men; and for the upright discharge of the trust committed, I leave you to your conscience and your country."

The jury retired, and after an absence of about three hours, returned a verdict of guilty against all of the defendants.

(September 29th, 1849.)

### SENTENCE OF THE RIOTERS.

The court convened at 11 o'clock, but before that time—for an hour or more previously—the vestibule and all the corridors leading to the court-room were crowded by persons who were anxious to hear the sentence.

Soon after convening the members of the court adjourned, for the purpose of consultation, to the assistant aldermen's room, and when they took their seats again

*Mr. Smith,* counsel for Judson, made a motion in arrest of judgment, which motion was denied, to which the counsel excepted; and *Mr. Blankman,* counsel for Bennett, made a similar motion for arrest of judgment, which likewise was denied. *Mr. Sherwood,* of counsel for Matthews, and *Mr. Cornell,* of counsel for Adriance, read affidavits in mitigation of punishment; and after all these proceedings had been concluded,

*The defendant Judson* proceeded to address the court at length. He said he had no favors to ask, and he expected no mercy. He had been tried by a prejudiced jury, and he might say, by a prejudiced court. His testimonials in favor of character, though freely offered to the prosecution, had neither been received nor read. He could safely lay his hand upon his heart, and appeal to his God, that he was the victim of an unjust persecution; that the testimony produced against him did not show that he had anything to do with the riot. His views, as expressed in his paper on the very day when the riot occurred, would show that he was in favor of law and order; that he was indifferent as be-

tween Forrest and Macready.  That if the testimonials regarding his character were known to the court, it would be seen what his character was.

Judge DALY here said that the court would hear everything he had to offer on that point.

He then read a letter from Commodore Moore.  After some further remarks, he said one of the jurors, Mr. Page, had declared during the progress of the trial, after he had left the court, that he thought the defendants ought to be hung.  In conclusion, he would say the influence of the press, and of public opinion, had been brought against him ; he had not had a fair trial—he felt that he was a victim—he stood there a martyr.

Judge DALY said, as respects the prisoners Matthews, Bennett, Douglass and O'Neill, the court have taken into consideration their youth and inexperience ; so far as they are concerned, the majesty of the law has been greatly vindicated by their conviction, and a very slight punishment in their case is sufficient for all the purposes which punishment was designed to effect.  They are not only young, but some of them have wives and children, and others stand honorably before the court as devoting the earnings of their young years to the support of aged and dependent parents. They will be sentenced, therefore, but to an imprisonment in the city prison for the term of thirty days.

As respects the prisoner Green, he is of mature age, and cannot plead youthful indiscretion as an excuse for his acts. He has read an affidavit to the court.

The judge then proceeded to point out and comment upon the manifest inconsistencies apparent upon the face of the affidavit ; still, as he had borne an irreproachable character, the court will be lenient.  He will be sentenced to the penitentiary for the term of one month.

The prisoner Adriance is also young ; he has a family, and his previous character is unstained.  But the evidence

People *v.* Judson.

against him is of the strongest nature.   He had particularly distinguished himself in resisting the attempts of the police to arrest offenders, and rallied the crowd to the rescue of prisoners.   He has been most virulent and vigorous against the police.   It is true, he has denied his identity with the person described by the officers.   But the court concur with the jury in believing his allegation unfounded.   He was arrested in the act.   The testimony reveals that he possesses a nature which can only be purified by punishment.   He must be taught to respect the institutions of his native land, and to learn the great duty of obedience to its laws.   He will be sentenced to the penitentiary for the term of three months.

The prisoner Judson has been patiently heard by the court.   He has complained that he has been tried by a prejudiced jury and a prejudiced court; and that there is no evidence of his guilt.   The jury are not here to listen to his complaint.   They have performed their duty and have been discharged.   They were indiscriminately selected from the great body of the prisoners' fellow-citizens; and it is due to them to say that they have been subjected to the most searching legal tests, and so far as these tests would indicate, they were as impartial a jury as have ever been impanneled.   As respects the prejudice of the court, it is not for them to say how far they may be subject to the most common of human infirmities.   They can but say that they feel an inward consciousness that they have done everything to secure to you a fair and impartial trial.   No human tribunal is infallible.   They have frequently interposed, in the course of the trial, with the prosecuting officers, and induced them to waive their objections to testimony not strictly legal, in the vague expectation that it might possibly tend to make out the innocence of the prisoners.   It is not true that you have been precluded from producing testimonials respecting your character.   All the prisoners have given evidence of character excepting yourself.   They have built up a strong wall about them, which stands them in stead in this their hour of trial.   You have not seen fit to

do so.   Your counsel offered certain testimonials while he was engaged in summing up for you; but there is no virtue in such an offer—the evidence was closed.   No tests could then be applied to determine their genuineness, nor any opportunity afforded to the district attorney to answer them.   You stand upon the presumption that the law makes in favor of the good character of every accused person, and you stand on that narrow boundary alone.   You say that your guilt is not established by the evidence.   The court, however, concur in the verdict of the jury, and it would have been extraordinary if that verdict had been otherwise. The evidence against you is clear, pointed and unmistakable. There was nothing to extenuate or prompt what you are proved to have done, but the wanton love of riot; you had no wrongs, fancied or real, to impel you to acts of violence; you did not claim to be a partisan in the theatrical dispute out of which the riot arose.   The very day of the riot, you had written and published an article indicating your indifference as between Forrest and Macready, and urging upon citizens the necessity of preserving the peace.   The day before the publication of this article you declared your intention of going to Astor Place to see Forrest through, and contemporaneous with the act of publication, you were disguising yourself in the habiliments of another, arming yourself with a sword and pistols, preparatory to visiting the scene.   When you reached there you at once assumed to take the direction of a portion of the mob, and arrange it systematically for the work of violence.   No motive appears to have impelled you but a desire to stir up the elements of popular tumult—to beget riot and mischief. Even in doing this, you appear to have been mindful of your personal security, and to have been busy in impelling others to acts you cared not yourself to perform.   You seem to have had the vanity to figure as a leader, without the courage to expose yourself as such.   As revealed by the evidence, there is a withering meanness in your conduct, when contrasted with the indifference to personal danger that characterized the bolder violence of the prisoner Adri-

ance. You have seen fit here to link yourself with the illustrious army of martyrs. What connection such acts as yours can have with the spirits whose lives have been trodden out in the defense of great principles, it is difficult to conceive. It might even be inferred from the testimony that you contemplated firing the theater, when that theater was filled with people; but for the honor of humanity, the court are unwilling to suppose a purpose so diabolical. It is before the court, however, that you counselled the firing of a lot of shavings, and the raising the cry of fire, indifferent to the awful consequences that might have followed the spreading of that alarm in a building densely packed with human beings. It is our duty to be merciful. As I remarked yesterday, we are not unmindful of the consideration that earthly power approaches nearest God's when mercy seasons justice. But we have a duty to perform to the community, and there is nothing in your case to waken the bubbling spring of mercy in the breast of the court. We feel it our duty to go, in your case, to the utmost limit of the law. We deem even that punishment inadequate, and in imposing it, said Judge DALY, I never felt so forcibly the want of power to make respected the laws of my country, whose minister I am.

Judson was then sentenced to one year's imprisonment in the penitentiary, and a fine of $250—to be imprisoned until paid.